UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                              )
DJAMEL OUADANI,               )
on behalf of himself and      )
all others similarly situated,)
                              )
                Plaintiff,    )    Civil Action
                              )    No. 16-12036-PBS
v.                            )
                              )
DYNAMEX OPERATIONS EAST, LLC  )
                              )
                Defendant.    )
_____)
```

**MEMORANDUM AND ORDER**

May 10, 2017

Saris, C.J.

**INTRODUCTION**

Plaintiff Djamel Ouadani brings this putative class action against Defendant, Dynamex Operations East ("Dynamex"), alleging violations of the Fair Labor Standards Act ("FLSA"), and the Massachusetts misclassification and wage laws. Pending before the Court is Dynamex's motion to compel arbitration and dismiss under the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16 (2012), and Fed. R. Civ. P. 12(b)(1) (Docket No. 14). After reviewing the parties' briefs and hearing argument, the Court **DENIES** the motion to compel arbitration and dismiss (Docket No. 14).

1

**FACTUAL BACKGROUND**

The relevant facts are drawn from Ouadani's complaint, exhibits to the complaint, and the Dynamex-Selwyn and Birtha Shipping, LLC Independent Contractor Agreement, which Dynamex filed in support of its motion. See Docket No. 15, Ex. 1.[1] Dynamex has not disputed any of these facts for the purposes of evaluating its motion to compel arbitration.[2]

Ouadani is a Cambridge, Massachusetts resident who responded to a Craigslist ad that Dynamex posted seeking delivery drivers in the Boston area. Dynamex contacted Ouadani and invited him to a meeting at Dynamex's offices in Wilmington, Massachusetts. Ouadani met with Dynamex employees, who described the services that Dynamex provided for Google Express. Ouadani also completed Dynamex paperwork (including his availability for delivery shifts), paid for a Dynamex t-shirt, and had his picture taken for a Dynamex ID badge. Dynamex employees told Ouadani that he would have to associate with one of three "Dynamex-affiliated vendors" in order to become a driver.

---

[1] The parties have not yet obtained discovery. However, neither party objected to hearing the motion at this stage.

[2] The First Circuit has not stated what standard the movant should be held to at this stage, although some courts have applied a summary judgment standard. See Proulx v. Brookdale Living Communities, Inc., 88 F. Supp. 3d 27, 29 (D.R.I. 2015) (citing cases). Neither party addressed the appropriate standard of review in its brief.

Ouadani associated with Selwyn and Birtha Shipping, LLC ("SBS"), but he never interviewed with its owner and manager, Edward Alwis, who also worked as a Dynamex delivery driver. Neither Dynamex nor SBS classified Ouadani as an employee.

Ouadani passed a drug test, received his Dynamex ID badge, a cell phone and scanner set up with Google Express software, and began performing delivery services, wearing his Dynamex shirt all the while. Dynamex also issued Ouadani a company email address, at which he received emails about shift scheduling, work policies, and delivery procedures. See Docket No. 1, Exs. 4-9. Ouadani made pickups and deliveries across greater Boston. SBS paid Ouadani an amount the former described as its payment from Dynamex less a 17.5 percent deduction, which SBS attributed to taxes and insurance. On August 22, 2016, Ouadani complained to Dynamex that he did not have the independence of a contractor and that he should be paid as an employee. The next day, Ouadani was permanently removed from the driver schedule, resulting in his termination.

Nearly three months before Ouadani's interview with Dynamex, Alwis, on behalf of SBS, signed a contract with Dynamex. That contract governed the relationship between SBS and Dynamex at all relevant times. Included in that agreement was an obligation that SBS "furnish at its own discretion, selection, and expense any and all Personnel required, necessary or

incidental to [SBS]'s performance" of contracted services. Docket No. 15, Ex. 1, at ¶ 6(b)(i). SBS was responsible for paying its employees for work performed in relation to the Dynamex-SBS independent contractor agreement. Id.

The Dynamex-SBS independent contractor agreement included a sweeping arbitration provision governed by the FAA. The arbitration clause covers disputes brought by SBS, Dynamex, "or any agent acting on behalf of either." Id. at ¶ 16(a)(i). The provision explicitly subjects to arbitration "disputes regarding any city, county, state or federal wage-hour law." Id.

**DISCUSSION**

I. **The Road to Arbitration**

Congress enacted the FAA in 1925 in "response to hostility of American courts to the enforcement of arbitration agreements, a judicial disposition inherited from then-longstanding English practice." Circuit City Stores, Inc. v. Adams, 532 U.S. 105, 111 (2001). To give effect to this purpose, section 2 of the FAA provides that written arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2 (2012); see also Circuit City, 532 U.S. at 111. In short, section 2 "is a congressional declaration of a liberal federal policy favoring arbitration agreements." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983). "At a

minimum, this policy requires that ambiguities as to the scope of the arbitration clause itself must be resolved in favor of arbitration." PowerShare, Inc. v. Syntel, Inc., 597 F.3d 10, 15 (1st Cir. 2010).

In cases where the applicability of the arbitration provision is unclear either in terms of scope or whether one or more parties is bound by the agreement, courts conduct additional inquiry. "[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." AT & T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 648 (1986) (quoting United Steelworkers of Am. v. Warrior & Gulf Navig. Co., 363 U.S. 574, 582 (1960)). The party seeking to compel arbitration must "demonstrate [1] that a valid agreement to arbitrate exists, [2] that the movant is entitled to invoke the arbitration clause, [3] that the other party is bound by that clause, and [4] that the claim asserted comes within the clause's scope." Soto-Fonalledas v. Ritz-Carlton San Juan Hotel Spa & Casino, 640 F.3d 471, 474 (1st Cir. 2011); see also McCarthy v. Azure, 22 F.3d 351, 354–55 (1st Cir. 1994). Regarding the third prong, "courts should be extremely cautious about forcing arbitration in situations in which the identity of the parties who have agreed to arbitrate is unclear." InterGen N.V. v. Grina, 344 F.3d 134, 143 (1st Cir. 2003).

Where one of the parties to a dispute is not a signatory to the contract containing the arbitration clause, there are typically five bases for requiring nonsignatories to arbitrate: "1) incorporation by reference; 2) assumption; 3) agency; 4) veil-piercing/alter ego; and 5) estoppel." Thomson-CSF, S.A. v. Am. Arbitration Ass'n, 64 F.3d 773, 776 (2d Cir. 1995). Two such theories and a third, related theory might apply here: agency, equitable estoppel, and third-party beneficiary.

## II. Forks in the Road

Dynamex argues that its independent contractor agreement with SBS is valid and that Ouadani's wage law claims are expressly covered by the arbitration provision in that agreement. Dynamex further argues that, even though Ouadani did not sign that agreement, the arbitration provision requires Ouadani to arbitrate his claims either because he was a SBS agent or a third-party beneficiary to the agreement, or because equitable estoppel prevents him from securing the benefits of the agreement (work for pay) while avoiding the arbitration provision.

Ouadani drives home one central argument: as a nonsignatory to the Dynamex-SBS agreement, he cannot be bound by the arbitration provision. Ouadani asserts that he had no knowledge of the agreement at any point before, during or after his time driving for Dynamex. It was only when Dynamex filed the pending

motion, Ouadani claims, that he learned that the agreement and its arbitration provision existed. At the hearing, Dynamex's counsel conceded that she had no information that Ouadani was aware of the agreement during the relevant time period. Rebutting Dynamex's agency theory, Ouadani argues that the principal's contract with a third party only binds the agent if the agent himself agrees. Ouadani asserts that he is not bound by the arbitration as a third-party beneficiary because the contract did not express a clear intent to afford rights and benefits to Ouadani or other drivers. Finally, Ouadani states that he cannot be bound to arbitrate on an equitable estoppel theory because he has not embraced the Dynamex-SBS agreement, or its benefits, in any way.

   a. **Agency**

"Traditional principles of agency law may bind a nonsignatory to an arbitration agreement." Thomson-CSF, S.A., 64 F.3d at 777. "[A]n agent is entitled to the protection of her principal's arbitration clause when the claims against her are based on her conduct as an agent." Grand Wireless, Inc. v. Verizon Wireless, Inc., 748 F.3d 1, 11 (1st Cir. 2014). Accord Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 7 F.3d 1110, 1121 (3d Cir. 1993) (applying traditional agency principles and permitting defendant's nonsignatory employee to invoke arbitration clause). The cases Dynamex relies on to bind

the nonsignatory agent to an arbitration clause by virtue of his agency are ones in which the nonsignatory agent was a defendant in the case seeking the protection of an arbitration clause in an agreement the plaintiff signed with the principal. The analysis in those cases focused on granting the agent the protection of the arbitration clause in order to prevent a signatory plaintiff from evading arbitration by suing an agent rather than the principal. See Pritzker, 7 F.3d at 1122.

This case is distinct. Ouadani is not seeking the protection of an arbitration clause, and he alleges that he was not aware the arbitration provision existed at any point while he worked for Dynamex, or up until Dynamex filed its motion. Ouadani cannot be bound to arbitrate on traditional agency principles.

  **b. Equitable Estoppel**

The doctrine of equitable estoppel precludes a party from enjoying rights and benefits under a contract while at the same time avoiding its burdens and obligations. InterGen, 344 F.3d at 145. On this basis, "a party may be estopped from asserting that the lack of his signature on a written contract precludes enforcement of the contract's arbitration clause when he has consistently maintained that other provisions of the same contract should be enforced to benefit him." Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH, 206 F.3d 411, 418 (4th

Cir. 2000). Federal courts generally "have been willing to estop a signatory from avoiding arbitration with a nonsignatory when the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed." Thomson-CSF, 64 F.3d at 779. But they have been hesitant to estop a nonsignatory seeking to avoid arbitration. InterGen, 344 F.3d at 145-46. In the latter situation, estoppel has been limited to "cases [that] involve non-signatories who, during the life of the contract, have embraced the contract despite their non-signatory status but then, during litigation, attempt to repudiate the arbitration clause in the contract." E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S., 269 F.3d 187, 200 (3d Cir. 2001).

Dynamex's equitable estoppel argument hits another roadblock. Dynamex has offered no evidence of how Ouadani secured the benefits of the Dynamex-SBS agreement before seeking to avoid arbitration. The First Circuit requires the nonsignatory to have "embraced" the contract during its life in order for equitable estoppel to prevent it from evading an arbitration provision. See InterGen, 344 F.3d at 146. The two cases Dynamex cites in support of its equitable estoppel theory involve more "knowing" embrace of the benefits of the contract containing the arbitration clause. See Kairy v. SuperShuttle Int'l, Inc., No. 08-02993, 2012 WL 4343220, at *9 (N.D. Cal.

9

Sept. 20, 2012); Fluehmann v. Assocs. Fin. Servs., No. 01-40076, 2002 WL 500564, at *7 (D. Mass. March 29, 2002).

Kairy is the closest case on point. Kairy involved FLSA and California wage and misclassification claims brought by airport shuttle franchisees and independent contractors. 2012 WL 4343220, at *1. Most of the plaintiffs signed contracts containing arbitration provisions, but, certain "secondary drivers" hired by franchisees did not sign agreements with the defendant. Id. at *9. In Kairy, the Court determined that the secondary drivers, despite their nonsignatory status, "knowingly exploited the rights and privileges granted under the [franchise] agreements." Id. The Court discussed how the wage claims required that the secondary drivers specifically perform under the franchise agreements. Id. Additionally, the Court deemed the secondary drivers to be "intended third party beneficiaries to the contracts." Id. Thus, Kairy rests both on a finding that the nonsignatory plaintiffs "knowingly exploited the rights and privileges under the agreements" and that the nonsignatory plaintiffs were "intended third-party beneficiaries" of those agreements.

Here, there is no evidence that Ouadani embraced the Dynamex-SBS contract, and it is clear he could not, given that he did not know it existed. At the hearing on its motion, Dynamex's counsel asserted that Ouadani embraced the benefits of

10

the Dynamex-SBS contract because that was how he determined that he was to be paid $72 for a four-hour shift. In his complaint, though, Ouadani alleges that Dynamex employees told him, during a meeting at Dynamex's offices, that he would be paid $72 for a four-hour shift. Docket No. 1, ¶ 5. And Dynamex cites no term in the Dynamex-SBS contract requiring SBS to pay its independent contractors at that rate, or at any particular rate at all. See Docket No. 15, Ex. 1, ¶ 6(b)(i).

To bind Ouadani on an equitable estoppel theory, Dynamex must show that Ouadani embraced the benefits of the Dynamex-SBS agreement. Dynamex has failed to meet its burden on the record before the Court.

### c. Third-party beneficiary

When the nonsignatory is a third-party beneficiary of the contract containing the arbitration clause, he or she may be forced to arbitrate. InterGen, 344 F.3d at 146. The law requires "special clarity" to support a finding "that the contracting parties intended to confer a benefit" on a third party. McCarthy, 22 F.3d at 362.

Dynamex's third-party beneficiary argument is unavailing. Dynamex has not pointed to any language in its agreement with SBS that meets the rigorous standard for establishing third-party beneficiary status. See InterGen, 344 F.3d at 146. Although the agreement obligates SBS to make sure that its

drivers "satisfy and comply with all terms" of the agreement, see Docket No. 15, Ex. 1, at ¶ 6(b)(v), that language does not express a clear intent to afford rights and benefits on Ouadani and other drivers. Cf. Torres v. Simpatico, Inc., 781 F.3d 963, 971 (8th Cir. 2015) (allowing nonsignatories to invoke arbitration clause as third-party beneficiaries where agreement expressly stated its intent "to benefit and bind certain third party non-signatories" via the arbitration provision).

### III. **End of the Road**

Dynamex advances no other theory for binding Ouadani, a nonsignatory, to arbitrate under the Dynamex-SBS independent contractor agreement. The Court will not address the other issues raised by Ouadani. In other words, that road ends here.

### **ORDER**

Dynamex's motion to compel arbitration and dismiss (Docket No. 14) is **DENIED**.

/s/ PATTI B. SARIS
Patti B. Saris
Chief United States District Judge