UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUETTS

Civil Action No. 16-12036-PBS

|  |  |
|---|---|
| DJAMEL OUADANI, on behalf of himself and all others similarly situated, | ) ) ) ) |
| Plaintiff | ) |
| v. | ) ) |
| DYNAMEX OPERATIONS EAST, LLC, | ) ) |
| Defendant | ) ) |

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

This case arises from the Defendant's misclassification of delivery drivers in Massachusetts. Plaintiff Djamel Ouadani brought the case on behalf of himself and all others similarly situated, pursuant to Fed. R. Civ. P. 23 and M.G.L. c. 149, § 150. Mr. Ouadani has moved for class certification as to two claims: for misclassification under M.G.L. c. 149, § 148B (Count I), and for violations of the payment of wages law, M.G.L. c. 149, § 148 (Count II). He now moves for summary judgment as to liability under Count I, because Mr. Ouadani and other members of the class were Dynamex's employees as a matter of law.[1]

Dynamex Operations East, LLC, now known as TForce Final Mile LLC, is a delivery company. From mid-2014 through October 2016, it had a contract to perform deliveries for Google Express, a business of Google Inc. that allows consumers to place online orders with local stores for same-day delivery. To perform this work, Dynamex recruited over 100 drivers like Mr. Ouadani. After Dynamex recruited, screened, and approved the drivers, they were

---

[1] Pursuant to the Court's prior order, discovery as to class damages will occur following a decision on class certification. (ECF Nos. 45-46).

directed by Dynamex to affiliate with one of Dynamex's "master contractors," who would then serve as the conduit through which the drivers were paid. Dynamex, however, directed the day-to-day work of the drivers.

The claim for misclassification turns on the three-pronged test of M.G.L. c. 149, § 148B. Under that test, the drivers were Dynamex's employees unless Dynamex can prove *all* of the following elements: (1) that the drivers were "free from control and direction in connection with the performance of the service, both under his contract…and in fact," (2) that the drivers' services were "performed outside the usual course of business of [Dynamex]," and (3) that the drivers were "customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed." M.G.L. c. 149, § 148B.[2] As discussed in more detail below, the undisputed facts demonstrate that Dynamex cannot satisfy the first prong – also known as the "control" prong – so the class is entitled to summary judgment in its favor as to liability under Count I.

### Facts

Pursuant to Local Rule 56.1, this motion is accompanied by Plaintiff's Statement of Material Facts and its exhibits.[3] Although that statement contains a more detailed set of facts and record support, the principal facts are straightforward.

---

[2] Dynamex need not prove the second of these three prongs, because that prong is preempted under federal law. *DaSilva v. Border Transfer of MA, Inc.*, 296 F. Supp. 3d 389, 397 (D.Mass. 2017), *citing Schwann v. FedEx Ground Packaging Sys., Inc.*, 813 F.3d 429, 442 (1st Cir. 2016).

[3] The exhibits to Plaintiff's Statement of Material Facts are designated in this motion as "[Ex. X]." Exhibit 3 to the Statement (a copy of Dynamex's contract with Google, marked as Deposition Exhibit 14) has been designated by Dynamex as confidential, subject to a confidentiality stipulation between the parties. As a result, Mr. Ouadani is moving to file that exhibit, along with the portion of Mr. Donovan's deposition transcript discussing that exhibit, under seal pending further order from the Court. Redacted copies of those exhibits are attached to the Statement.

Defendant Dynamex Operations East, LLC, now known as TForce Final Mile LLC[4] ("Dynamex"), is a transportation company headquartered in Dallas, Texas. It has a branch office in Wilmington, Massachusetts. In mid-2014, Dynamex entered into an agreement with Google Inc. ("Google") to provide delivery services for Google Express, requiring Dynamex's "representatives" to pick up packages from designated stores (such as Target, Walgreens, Staples, etc.) and deliver them to designated drop-off locations, pursuant to designated procedures. The agreement between Google and Dynamex imposed specific requirements on how delivery work was to be performed, and Dynamex was responsible for ensuring that those requirements were adhered to by its delivery personnel. Dynamex's Wilmington office provided services to Google Express in the Boston area until in or around November 2016, when Google terminated the contract.

Dynamex classified all drivers who performed delivery work for the Google account in Massachusetts as independent contractors. In the beginning of the Google account, Dynamex had direct contracts with drivers, but in or around October 2014, it implemented a system where it used so-called "master independent contractors" (or "Master ICs"), who had drivers assigned to them. Drivers who were assigned to Master ICs were referred to by Dynamex as "indirect drivers." Dynamex has identified over 100 individuals who performed Google Express services in Massachusetts between July 16, 2014 and October 14, 2016 as such "indirect drivers."

Dynamex recruited drivers for the Google account through advertisements on Internet sites such as Craigslist or Indeed. Those advertisements indicated, among other things: (1) that

---

[4] *See* Answer and Affirmative Defenses to Plaintiff's Complaint and Jury Demand (ECF No. 44) at p.1.

Dynamex was looking for "independent contractors," (2) that contractors needed their own transportation, and (3) that a driver's compensation would be "shift pay/no commission." When a potential driver contacted Dynamex, the driver was called into the Wilmington office to meet with a Dynamex manager or managers. Dynamex had the prospective drivers fill out an application and various forms, consent to a background and driving check, and submit to a drug test. One of the forms that Dynamex required drivers to complete and sign was a contract entitled, "Indirect Driver/Helper Deduction Agreement." That agreement referred to drivers as independent contractors.

Before drivers could perform work on the Google account, Dynamex required them to go through an orientation and training process. Dynamex issued drivers a scanner, called a "Socket" scanner, and sometimes phones, as well. Dynamex also issued drivers badges and shirts that said, "Dynamex." At some point during the orientation or onboarding process, Dynamex provided a new driver with a list of 3-5 Master ICs, and the driver would have to choose one with whom to associate. Once Dynamex onboarded a new driver, it would notify Google about the driver, and Google would issue an email address to the driver with the extension "dynamex.courier-ops.com."

Once approved by Dynamex to perform work for Google, drivers would report their available days and times directly to Dynamex. Dynamex then assigned drivers to specific shifts based on Google's needs. Shifts were set for specific times and durations, so drivers had to conform to those specific shifts. Drivers were required to report to their assigned starting location 15 minutes before their shift. Drivers were not permitted to log in until 5 minutes before their shift or if they were not at their staging location. If Drivers failed to appear for a shift or logged in late, Dynamex made deductions from the drivers' payments.

Once a driver logged in and began his shift, he or she was required to perform deliveries in the specific order in which the deliveries were assigned, using the routes provided by Google. Dynamex issued various directives to drivers. For example, drivers were prohibited from picking up packages that were scheduled for later pick-ups. Drivers also were required by Dynamex to maintain a certain appearance:

> You must be in Dynamex uniform when you are clocked in for a shift, you must have your shirt or jacket as well as your ID worn every day. Your car must have an empty/organized trunk and or cargo area, keep your vehicles clean inside and out, and greet everyone with a smile…these are all simple little things, but demonstrate that you are a professional who understands the importance of looking and behaving as such.

Dynamex paid for a driver's services on a weekly basis, as reflecting in weekly payment statements issued for each driver. Dynamex sent the payments to the Master IC or Agent to whom the driver was assigned, and the Master IC or Agent then paid the driver. Drivers were paid at a fixed rate for a shift, regardless of how long the shift took to complete or how many miles the driver drove.

Dynamex made or passed along various deductions from a driver's pay. Deductions were made for items such as background investigations, uniforms, insurance, scanners, and radios. Deductions also were made for "cargo claims," which involved allegedly missed or damaged deliveries. Deductions also were made if a driver clocked in late.

Dynamex used a proprietary system called "DECS" (an acronym for Dynamex Enterprise Courier Software) to maintain data about individual drivers. The DECS system contains, among other things, personal information about drivers, dates of shifts performed by the driver, amounts paid for shifts performed by the driver, and the purpose and amount of any deductions related to the driver. DECS can be used to produce various reports about a driver, including a weekly

5

register that shows the number of shifts worked by a driver, the driver's pay per shift, and deductions from the driver's pay.

Google slso recorded detailed data about each driver's shift, including the amount of time worked, the number of deliveries performed, and the number of miles driven. As part of its work for Google, Dynamex received regular reports from Google with data about various driver performance metrics. Google was able to provide reports to Dynamex on request, including reports showing the number of miles driven by a driver on any given shift. Dynamex also had online access to Google data regarding driver work and performance.

## Argument

**1.      Summary judgment standard.**

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). This test is "steeped in reality," meaning that "conjectural or problematic" factual disputes do not preclude summary judgment. *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990). Rather, the "evidence illustrating the factual controversy . . . must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve." *Mack v. Great Atlantic and Pacific Tea Co.*, 871 F.2d 179, 181 (1st Cir. 1989). Either party may move for summary judgment on any part of a claim or defense, including seeking partial summary judgment on liability while leaving the matter of damages open for later proceedings. *Id.*; *In re Vazquez Laboy*, 647 F.3d 367, 375 (1st Cir. 2011) ("The opportunity for a plaintiff to present evidence on damages after winning partial summary judgment on liability is a right so fundamental in civil proceedings that it normally goes without saying").

**2.      The Massachusetts wage laws have been interpreted broadly to protect employee rights.**

Under Massachusetts law, it is well established that a court must interpret remedial statutes broadly to accomplish their purposes. *Psy-Ed Corp. v. Klein*, 459 Mass. 697, 708 (2011) (it is "an error," when construing remedial statutes, to "imply [any limitations] where the statutory language does not require it"). Based on this principle, the Massachusetts wage laws must be construed liberally in favor of employees. *Depianti v. Jan-Pro Internat'l, Inc.,* 465 Mass. 607, 620 (2013) ("remedial statutes such as the independent contractor statute are 'entitled to liberal construction.'"). For that reason, courts repeatedly have interpreted the wage laws in an expansive manner to protect the rights of employees. *See, e.g., id.* at 619-25 (plaintiff need not prove existence of contract to state claim for misclassification).[5]

Section 148B is no less important than any other wage law, as demonstrated by the structure, language, and history of that statute. In addition to putting the burden of proof on presumptive employers to establish independent contractor status, the Legislature has amended the law to further strengthen its provisions. *See, e.g.*, 2004 Mass. Adv. Legis. Serv. 193, § 26 (making changes to strengthen section 148B, including (1) making it easier to establish

---

[5] *See also Cook v. Patient Edu, LLC,* 465 Mass. 548, 550-56 (2013) (rejecting employer's attempt to interpret Wage Act narrowly with respect to individual liability); *Awuah v. Coverall North America, Inc.*, 460 Mass. 484, 497-99 (2011) (requiring employee to pay for job violates wage law); *Camara v. Attorney Gen.*, 458 Mass. 756, 759 (2011) (chargebacks constitute unlawful deductions under wage law); *Somers*, 454 Mass. at 591 (based on statute's strict language, a presumptive employer's intent or good faith do not matter); *DiFiore v. American Airlines, Inc.*, 454 Mass. 486, 493 (2009) (interpreting term "service charge" in tips law to protect wage earners from risk that employers may seek to use special contracts to avoid compliance with statute); *Elec. Data Sys. Corp. v. Attorney General*, 454 Mass. 63, 70 (2009) (rejecting employer's attempt to read vacation pay provision narrowly); *Mullally v. Waste Mgt. of Mass., Inc.*, 452 Mass. 526, 531 (2008) (rejecting employer's attempt to read overtime law narrowly); *Cooney v. Compass Group Foodservice*, 69 Mass. App. Ct. 632, 638 (2007) (rejecting employer's attempt to read tips law narrowly).

individual liability by providing that "[a]ny entity and the president and treasurer of a corporation and any officer or agent having the management of the corporation or entity shall be liable for violations of this section" and (2) where prong two of section 148B(a) previously read, "and such service is performed either outside the usual course of the business for which the service is performed *or is performed outside of all places of business of the enterprise*," amendment deleted italicized language, making it more difficult for presumptive employers to establish independent contractor status). In addition to the plain intent of the Legislature, the Executive Branch has demonstrated its concern about the deleterious effects of independent contractor misclassification through the creation of a Joint Task Force on the Underground Economy and Employee Misclassification. *See* Exec. Order No. 499 (March 12, 2008), available at http://www.mass.gov/governor/legislationeexecorder/executiveorder/executive-order-no-499.html. In his Executive Order establishing the Joint Task Force, Governor Patrick explained that the problems created by employee misclassification include exploitation of workers, unfair competition, lost tax revenues, and harm to consumers. *Id.* These same concerns were explicitly recognized by the Supreme Judicial Court in *Somers*, 454 Mass. at 592-93 (describing adverse consequence of misclassification).

**3.      The class is entitled to summary judgment as to their employment status, because Dynamex cannot satisfy the control prong of section 148B.**

There is no genuine dispute that the indirect drivers in the putative class provided services to Dynamex. Indeed, the services that drivers provided to Dynamex – after being recruited, screened, and trained by Dynamex – was what fulfilled Dynamex's contractual obligations to Google. To defeat the claim that they were misclassified as independent contractors, therefore, Dynamex must prove *each* of the three prongs of § 148B:

> (1) the individual is free from control and direction in connection with the performance of the service, both under his contract for the performance of service and in fact; *and*
>
> (2) the service is performed outside the usual course of the business of the employer; *and*
>
> (3) the individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed.

M.G.L. c. 149, § 148B(a) (emphasis added). This test is conjunctive, so the Massachusetts drivers were employees for purposes of the wage laws unless Dynamex can prove all three of the prongs. *Somers*, 454 Mass. at 590-91 ("[U]nless [the defendant] were to prove at trial the three criteria required to establish that the plaintiff was an independent contractor under G.L. c. 149, § 148B the plaintiff, as a matter of law, was an employee of [the defendant] even if he was not hired as an employee.") (emphasis in original).

As a threshold matter, it does not matter whether an employee purportedly agreed or acknowledged – by written agreement or otherwise – that he was an independent contractor. *Awuah v. Coverall North America, Inc.*, 707 F. Supp. 2d 80, 83-85 (D.Mass. 2010) ("regardless of the agreement between the employer and the individual or the intent of the employer, if the employer cannot satisfy the three prongs, the individual is an employee '[and to] this extent, § 148B is a strict liability statute....'"), *citing Somers*, 454 Mass. at 591 (other citations omitted). *See also Melia v. Zenhire, Inc.*, 462 Mass. 164, 170 (2012) ("An agreement to circumvent the Wage Act is illegal even when 'the arrangement is voluntary and assented to.'"), *quoting Camara.*, 458 Mass. at 760–761. As a result, it does not matter whether indirect drivers believed they were working as an independent contractor, and it does not matter whether they contractually agreed to work as an independent contractor.

In order to prevail under the first prong of section 148B, Dynamex must show that the indirect drivers were "free from [its] control and direction in connection with the performance of

9

the service, both under [the] contract for the performance of service and in fact." M.G.L. c. 149, § 148B(a)(1). In *DaSilva v. Border Transfer of MA, Inc*., 296 F. Supp. 3d 389 (D.Mass. 2017), this Court recognized that a defendant must prove two separate elements of this prong: "Due to the conjunctive nature of this test, a company asserting that a worker is an independent contractor must how that the individual was free from its control both as a matter of contract and as a matter of fact." *Id*. at 400 (emphasis in original).

Because the Massachusetts unemployment statute uses a test that is nearly identical to the independent contractor statute, *compare* M.G.L. c. 151A, § 2 *with* M.G.L. c. 149, § 148B(a), it is useful to look to cases decided under the unemployment statute. *See* Massachusetts Attorney General, *An Advisory from the Attorney General's Fair Labor Division on M.G.L. c. 149, § 148B, 2008/1* ("Advisory 2008/1) at 2-3 ("Massachusetts case law interpreting M.G.L. c. 151A, s. 2 provides a useful guide to interpreting M.G.L. c. 149, s. 148B"). In *Div. of Unemployment Assistance v. Town Taxi of Cape Cod*, 68 Mass. App. Ct. 426 (2007), the Appeals Court provided the following description of a defendant's burden under the control prong:

> The first part of the test examines the degree of control and direction retained by the employing entity over the services performed. The burden is on the employer to demonstrate that the services at issue are performed free from its control and direction. The test is not so narrow as to require that a worker be entirely free from direction and control from outside forces.

*Id*. at 434 (citations omitted). The principal question is whether the employer exercised any control over the means and methods of the work performed. *Athol Daily News v. Bd. of Review of Div. of Employment And Training*, 439 Mass. 171, 177-78 (2003) ("The essence of the distinction … has always been the right to control the details of the performance … and the freedom from supervision 'not only as to the result to be accomplished but also as to the means and methods that are to be utilized in the performance of the work.'"), *quoting Maniscalco v.*

*Director of the Div. of Employment Sec.*, 327 Mass. 211, 212 (1951). *See also* Advisory 2008/1 at 3 ("To be free from an employer's direction and control, a worker's activities and duties should actually be carried out with minimal instruction. For example, an independent contractor completes the job using his or her own approach with little direction and dictates the hours that he or she will work on the job.").

The undisputed evidence in this case demonstrates that Dynamex will be unable to satisfy either element of the control prong. That conclusion follows from the undisputed fact that Dynamex's contract with Google required that Dynamex exercise control over its drivers. (Depo. Ex. 14 [Ex. 3] at pp.1-6). Google plainly, and for obvious business reasons, wanted to ensure that all of the drivers that Dynamex used to perform Google Express deliveries were performing those deliveries using means and methods that comported with Google's technology needs and reputational concerns. Likewise, Dynamex obviously wanted to ensure that all the drivers it used to perform Google Express deliveries did so in a way that kept its customer (Google) happy. Dynamex had another good reason to control the work of drivers: from the perspective of customers, delivery drivers were part of the Dynamex delivery business, as indicated by the badges and uniforms worn by drivers, so Dynamex had an interest in protecting its own reputation and goodwill.

The contractual requirement that Dynamex exercise control over its drivers carried over to the way that drivers were, in fact, controlled by Dynamex. After Dynamex recruited drivers through public postings – on Craigslist, for example – it screened them though background checks and drug tests. (Donovan Depo. [Ex. 2] at 50:12-18, 51:12-22; Ouadani Depo. [Ex. 6] at 34:21-35:1, 62:7-63:10). It required that drivers go through its orientation and training process. (Donovan Depo. [Ex. 2] at 54:11-55:6; Ouadani Depo. [Ex. 6] at 41:17-42:12, 63:24-65:8). It

issued drivers a specific piece of equipment necessary to perform the Google Express work, called a "Socket" scanner. (Donovan Depo. [Ex. 2] at 56:4-21; Ouadani Depo. [Ex. 6] at 37:20-38:1). It issued drivers a Dynamex-branded badge and uniform, both of which drivers needed to wear. (Donovan Depo. [Ex. 2] at 52:2-16, 56:22-57:12, 126:1-13; Ouadani Depo. [Ex. 6] at 35:20-36:19; Depo. Ex. 1 [Ex. 7] at Document 1-3; Depo. Ex. 26 [Ex. 10]).

After drivers were approved, outfitted, and ready to perform work, Dynamex assigned drivers to specific shifts based on Google's needs. (Donovan Depo. [Ex. 2] at 75:13-77:18; Alwis Depo. [Ex. 12] at 27:11-28:17; First Int. Answers [Ex. 11] at 6-7; Depo. Ex. 1 [Ex. 7] at Document 1-4). Shifts were set for specific times and durations, so drivers had to conform to those specific shifts. (Depo. Ex. 1 [Ex. 7] at Document 1-5 at 3, Document 1-8). Drivers were required to report to their assigned starting location 15 minutes before their shift. (Donovan Depo. [Ex. 2] at 79:8-13). Dynamex issued directives to drivers that they were not permitted to log in until 5 minutes before their shift or if they were not at their staging location. (Donovan Depo. [Ex. 2] at 79:14-80:4; Depo. Ex. 1 [Ex. 7] at Document 1-5). If Drivers failed to appear for a shift or logged in late, Dynamex made deductions from the drivers' payments. (Donovan Depo. [Ex. 2] at 114:3-116:21, 126:14-127:13; Depo. Ex. 1 [Ex. 7] at Document 1-13 at 2-7; Depo. Ex. 27 [Ex. 13]).

Once a driver logged in and began his shift, he or she was required to perform deliveries in the specific order in which the deliveries were assigned, and using specific routes. (Donovan Depo. [Ex. 2] at 82:20-83:5, 168:22-169:4; Ouadani Depo. [Ex. 6] at 78:8-79:6). Dynamex issued a directive to drivers that they were prohibited from picking up packages that were scheduled for later pick-ups, stating, as an example, "If you go to Costco to pick up some parcel, and notice that you have to go back to Costco later to pick-up additional parcels, there are no

exceptions, you are not allowed to pick-up the other parcels whether they are ready or not." (Depo. Ex. 1 [Ex. 7] at Document 1-7). Dynamex also issued a directive to drivers as to how they were required to pick up parcels from particular stores. (Depo. Ex. 1 [Ex. 7] at Document 1-15). During their shifts, drivers were issued additional directions or instructions by Dynamex dispatchers in New York or managers in Massachusetts. (Donovan Depo. [Ex. 2] at 192:16-193:17, 200:6-201:17; Alwis Depo. [Ex. 12] at 169:24-171:6; Ouadani Depo. [Ex. 6] at 66:13-23; Depo. Ex. 27 [Ex. 14]).

> Dynamex required drivers to maintain a certain appearance:
>
> You must be in Dynamex uniform when you are clocked in for a shift, you must have your shirt or jacket as well as your ID worn every day. Your car must have an empty/organized trunk and or cargo area, keep your vehicles clean inside and out, and greet everyone with a smile…these are all simple little things, but demonstrate that you are a professional who understands the importance of looking and behaving as such.

(Depo. Ex. 1 [Ex. 7] at Document 1-9).

Dynamex also required drivers to participate in additional training. (Donovan Depo. [Ex. 2] at 125:3-23; Ouadani Depo. [Ex. 6] at 96:5-19; Depo. Ex. 25 [Ex. 15]; Depo. Ex. 1 [Ex. 7] at Document 1-6). As indicated in an email from Dynamex to drivers: "<u>Everyone needs to complete</u> the **Delivery Run** Course, the **Delivery re-attempt** course, and the **Temperature Sensitive** course. Even if you took the Delivery Run course in the past it has been updated to include several new changes, <u>so you must take it again</u>." (Depo. Ex. 1 [Ex. 7] at Document 1-6) (emphasis in original). Ultimately, if drivers were not performing to certain standards, they would "keep getting orientated" and could lose the right to get any further assignments. (Donovan Depo. [Ex. 2] at 79:24-82:19).

In *Vargas v. Spirit Delivery & Dist. Svcs., Inc.*, 245 F. Supp. 3d 268 (D.Mass. 2017), another court in this District ruled that the defendant in a similar case narrowly escaped summary

judgment under the first prong of section 148B. *Id*. at 285. That result followed from the defendant's ability to offer sufficient evidence to rebut the plaintiff's contentions "that [the defendant] controlled when he was required to show up, how his truck was loaded, who determined the route he followed and the order in which deliveries were made." *Id*. This case is different. Here, there is no dispute that indirect drivers *were* subject to control in all of these ways – that is, among numerous other requirements, drivers were told when and where they needed to show up; they were prohibited from loading future deliveries into their cars; and they were required to follow specific orders and routes for their assigned deliveries.

In short, given the undisputed evidence about its contractual requirements and its actual exercise of control over drivers, Dynamex will be unable to prove the control prong of section 148B. As a result, the drivers in the class were Dynamex employees for purposes of the Massachusetts wage laws.

**Conclusion**

For these reasons, Mr. Ouadani respectfully requests that the Court grant summary judgment in favor of the class as to their status as employees of Dynamex.

DJAMEL OUADANI, on behalf of himself
and all others similarly situated,

By his attorneys,

/s/ Stephen Churchill
Stephen Churchill, BBO#564158
Hillary Schwab, BBO#666029
Rachel Smit, BBO#688294
FAIR WORK, P.C.
192 South Street, Suite 450
Boston, MA 02111
617-607-3260
steve@fairworklaw.com
hillary@fairworklaw.com
rachel@fairworklaw.com

Dated: October 14, 2018

## CERTIFICATE OF SERVICE

I certify that on this date a copy of this document was served, by ECF, on all counsel or record.


Dated: October 14, 2018                     /s/ Stephen Churchill
                                        Stephen Churchill