_____
                                        )
DJAMEL OUADANI,                         )
on behalf of himself and               )
all others similarly situated,          )
                                        )
                    Plaintiff,          )          Civil Action
                                        )          No. 16-12036-PBS
v.                                      )
                                        )
DYNAMEX OPERATIONS EAST, LLC,           )
                                        )
                    Defendant.          )
_____)

**MEMORANDUM AND ORDER**

September 13, 2019

Saris, C.J.

**INTRODUCTION**

Plaintiff Djamel Ouadani ("Ouadani") brings this lawsuit against Defendant, Dynamex Operations East, LLC ("Dynamex"), alleging violations of the Fair Labor Standards Act ("FLSA"), and the Massachusetts misclassification and wage laws. He asserts individual, class, and collective claims arising from Dynamex's practice of classifying drivers who perform Google Shopping Express deliveries as independent contractors. Pending before the Court are Ouadani's motion to certify a class of Google Express delivery drivers for his state law misclassification and improper deductions claims and his motion for partial summary judgment on the misclassification claim.

1

After hearing, the Court **ALLOWS IN PART** and **DENIES IN PART** Ouadani's motion for class certification (Dkt. No. 70) and **DENIES** his motion for partial summary judgment (Dkt. No. 71).

**FACTUAL BACKGROUND**

The following facts are undisputed except where otherwise stated.

## I.    **The Parties**

Ouadani performed Google Express deliveries from March 2016 to August 2016. He contracted directly with Selwyn & Bertha LLC ("S&B"), which was one of companies Dynamex used to supply drivers for Google Express deliveries. S&B classified and paid Ouadani as an independent contractor, not an employee.

Dynamex, which is now doing business as TForce Final Mile LLC, is headquartered in Dallas, Texas and operates a branch office in Wilmington, Massachusetts. Dynamex is a provider of transportation logistics services, which include providing same-day delivery services for its clients. From June 1, 2014 to October 14, 2016, Dynamex contracted with Google Inc. ("Google") to provide drivers to make Google Express deliveries across several major U.S. cities, including Boston, Massachusetts. Dynamex's Wilmington office was responsible for Google Express deliveries in the Greater Boston area.

## II. __Dynamix's Business__

*a. The Google Express Contract*

Google Express is a same-delay delivery service that allows consumers to place delivery orders online from local retail stores such as Target, Walgreens, or Staples. Dynamex entered into a Statement of Work ("SOW") with Google effective June 1, 2014. Under the SOW, it agreed to provide drivers to perform Google Express deliveries for a two-year period. Prior to the expiration of the SOW, Dynamex and Google entered into an amendment to the SOW ("Amended SOW") effective June 1, 2016. The Amended SOW was to last until November 30, 2016 unless otherwise terminated by the parties. The SOW and the Amended SOW included substantially the same terms. Google terminated the Amended SOW sometime in October 2016. Dynamex stopped performing services under the Amended SOW on October 14, 2016.

The SOW (and the Amended SOW) included a list of minimum qualifications for Google Express drivers. Drivers were required to have at least two years of experience, have a clean driving record, speak fluent, understandable English, and be comfortable using a smartphone and related technology. They were also required to be well-groomed and wear approved Google apparel. Dynamex was responsible for making sure drivers satisfied these qualifications. The SOW also required that the drivers complete a Google Express orientation and abide by Google's standard

operating procedures in making deliveries. Dynamex was responsible for training the drivers on Google's standard operating procedures. This included administering Google-designed training programs but also "developing and coordinating orientation programs based on identified needs." Dkt. No. 72-3 at 3-4. For example, it was Dynamex's responsibility to "initiat[e], maintain[] and supervis[e] all necessary safety precautions and programs." Id. at 4. Once drivers were trained, Dynamex had a continuing obligation to monitor driver performance to ensure that deliveries were made on time and in accordance with Google's standard operating procedures.

b. *Masters, Agents, and Indirect Drivers*

Dynamex contends it did not have any W-2 employees that performed Google Express deliveries. In the beginning, deliveries were performed by (1) independent contractors who contracted directly with Dynamex, (2) drivers who worked for Master Independent Contractors ("Masters") that contracted with Dynamex, and (3) drivers who worked for Agents that contracted with Dynamex. After October 31, 2014, however, Dynamex ceased contracting directly with individual drivers and, from that point forward, all Google Express deliveries were made by drivers who were associated with either a Master or an Agent.[1]

----

[1] According to Ralph Donovan, Dynamex's designated Rule 30(b)(6) witness and the branch manager of the Wilmington

Masters were the primary source of drivers Dynamex used to complete Google Express deliveries. Masters contracted directly with Dynamex. In order to be eligible, Masters were required to have a business license and be an incorporated company, limited liability company ("LLC"), or special corporation. There were two type of drivers provided by Masters: the owners of the contracting "Master" entities and other individuals who contracted with or were employed by Masters. Dynamex referred to the latter group as "Indirect Drivers." Masters were required to have at least one Indirect Driver (the owners were permitted but not required to be drivers). Masters also had to provide insurance for their drivers, which they could purchase through Dynamex. Dynamex used at least 19 Masters to perform Google Express deliveries in Massachusetts: Banana Hill Courier Service, Braulio Vega, Elite Delivery Services Inc., Eureka Logistics, Omega Express Courier Service, R&R Courier Service, LLC, Rafferty & Family Enterprises, LLC, Red Line Trucking LLC, RMB Transport, Roberto Ozuna LLC, S&B,[2] Sam Courier, Soni Courier Service LLC, TDOO Express Services Inc., Thomas Multi Services LLC, Time Bandit Courier, Topline Courier, United Transportation

office, this policy change was prompted in part by a prior class action lawsuit.

[2]    S&B was an Agent from May 6, 2015 to January 6, 2016, at which point it entered into a new contract with Dynamex that converted it to a Master.

System LLC, and World Trans Inc. In total, Masters provided Dynamex with 122 Indirect Drivers that performed Google Express deliveries in Massachusetts during the proposed class period.

Agents were larger transportation companies that Dynamex used when it needed additional drivers to cover excess demand for Google Express delivery services. Agents also contracted directly with Dynamex. Like Masters, Agents were required to have a business license and be an incorporated company, LLC, or special corporation. Unlike Masters, however, they needed to have a verifiable brick-and-mortar location, a website, and more than ten total drivers. Agents also had to perform their own background checks, drug tests, and vehicle checks and were solely responsible for providing insurance for their drivers. Finally, 50% or more of Agents' business had to come from companies other than Dynamex. Dynamex referred to all drivers provided by Agents as "Indirect Drivers." Dynamex used two Agents to perform Google Express deliveries in Massachusetts: Famm Driving and Patriot Express Logistics LLC. In total, Agents provided Dynamex with eight Indirect Drivers that performed Google Express deliveries in Massachusetts during the proposed class period.

In general, Dynamex did not require its Masters to classify their drivers as either W-2 employees or independent contractors. However, Elite Delivery Services Inc., Omega

Express Courier Service, LLC, Rafferty & Family Enterprises LLC, and Topline Courier signed a "Broker/Motor Carrier Master Agreement" with Dynamex in 2009 which required that all drivers either be "directly employed and paid hourly by [the Master] or provided to [the Master] by a bona fide employment staffing agency."[3] Dkt. No. 79-2 at 16-17, 27-28, 56-57, 171-72. A representative from R&R Courier Service, LLC also has submitted an affidavit stating that it employed its Indirect Drivers as W-2 employees. In total, the Masters and Agents who are known to have used W-2 employees provided Dynamex with 18 Indirect Drivers. Meanwhile, S&B classified its Indirect Drivers as independent contractors who filed Form 1099s with the IRS. Ouadani also attempted to subpoena employment records from 19 of the Masters and Agents. Only six Masters or Agents responded to the subpoenas, and only two of those -- Eureka Logistics and Patriot Express Logistics LLC -- produced tax forms for their Indirect Drivers. According to the tax forms, both Eureka Logistics and Patriot Express Logistics LLC paid their Indirect Drivers as independent contractors. In total, the Masters and Agents who are known to have used independent contractors provided Dynamex with 36 Indirect Drivers. It is not clear from

---

[3]    A representative from Rafferty & Family Enterprises LLC also has submitted an affidavit confirming that it employed its Indirect Drivers as W-2 employees.

the record whether the remaining Masters and Agents classified
their drivers as W-2 employees or independent contractors.

   c.   *Recruiting, Onboarding, and Orientation*

   Certain basic facts about the recruiting and onboarding of
Indirect Drivers are undisputed. Pursuant to its contracts with
the Masters, Dynamex performed the background checks, driving
checks, drug tests, and other onboarding tasks for Indirect
Drivers who worked for Masters. Dynamex did not perform these
tasks for Indirect Drivers who worked for Agents. Rather, under
their contracts with Dynamex, the Agents handled most onboarding
tasks and certified to Dynamex that they had been completed.
Otherwise, the parties extensively dispute the process by which
drivers came to be drivers for Google Express.

   Ouadani claims that Dynamex recruited the Indirect Drivers
through internet advertisements on websites such as Craigslist
and Indeed.com. The advertisements specified that Dynamex was
looking for independent contractors with their own vehicles who
were willing to work for shift pay and no commissions. Indeed,
this is how Ouadani first learned about the opportunity to
perform Google Express deliveries. Dynamex concedes that from
March 16, 2016 to June 10, 2016 it ran such an advertisement but
insists that advertisement was placed by mistake and was an
exception to its ordinary practice. Dynamex claims that the rest
of time it only advertised for third-party companies (i.e.,

Masters and Agents) that could provide drivers to perform deliveries for its clients, such as Google. Dynamex also points out that not all the Indirect Drivers approached it directly. Some drivers, for example, were associated with Masters well before they began driving for Google Express. In those cases, the Masters would suggest to Dynamex the drivers they wanted to perform Google Express deliveries, which would trigger the onboarding process.

Ouadani also contends that when prospective drivers contacted Dynamex about performing delivery services in response to an advertisement, Dynamex would ask them to come into its Wilmington office. Once there, Dynamex would have the prospective drivers fill out paperwork and submit to a drug test. The paperwork included a job application and consent forms for background and driving checks. Ouadani claims Dynamex then "assigned" prospective drivers to the Masters with whom they would contract directly.

Dynamex disputes many of the details of how Ouadani characterizes this process. First, it denies that the process always followed this order. Instead, Dynamex contends that ordinarily once a prospective driver contacted the company, it would refer them to the Masters before completing any additional onboarding. Second, it denies that prospective drivers filled out a job application or that it "assigned" the drivers to

Masters. Dynamex contends that when prospective drivers first came to its office they were provided with a list of Masters who might be hiring. Both the drivers and the Masters were then free to decide whether or not to enter into an employment relationship. If a prospective driver and a Master did choose to associate, then the Master would send the driver back to Dynamex for onboarding.

Regardless of how the Indirect Drivers came to Dynamex, the SOW required that all Indirect Drivers complete an orientation program before they could began performing Google Express deliveries. The parties do not dispute the essential details of the orientation program. The first part of the program was a three to five-hour training called "Intrepid" which was designed by Google. Intrepid covered various subjects, including how to interact with customers, perform deliveries, and resolve delivery issues consistent with Google's standard operating procedures. The Indirect Drivers completed the Intrepid training at Dynamex's Wilmington office. The second part of the program was an online training called "Marshall" which also was designed by Google and was intended to familiarize the Indirect Drivers with the Google application they would be using to make deliveries. The final part of the program was an on-the-road orientation where the Indirect Drivers rode along with more experienced drivers to get hands on experience before performing

deliveries solo -- the more experienced driver was not always from the same Master or Agent as the trainee driver.

As part of the onboarding process, Google would issue each driver an email address with the extension "dynamex.courier-ops.com" that Google used to communicate with them. The Indirect Drivers also were required to use a Google-approved phone and a "Socket" scanner. Ouadani claims that Dynamex issued the required phones and scanners to the Indirect Drivers. Dynamex disagrees, claiming that it did not issue or lease any equipment directly to the Indirect Drivers. Instead, the Indirect Drivers leased the phones and scanners from their Masters or Agents, who in turn had leased them from Dynamex, who in turn leased them from Google.

d.  *Scheduling and Deliveries*

Once the Indirect Drivers had been onboarded, trained, and supplied with the necessary equipment, they were ready to begin making deliveries. Up until mid-August 2016, the standard Google Express shift was four hours long. From mid-August to October 2016, shifts were between four and six hours long. Shifts were scheduled based on Google's anticipated need for drivers and the availability of individual drivers. Ouadani claims that the drivers reported their availability directly to Dynamex, and then Dynamex scheduled their shifts. Dynamex disputes that this was always the case. According to Dynamex, sometimes the

Indirect Drivers would inform Dynamex of their availability, but other times they would inform their Masters or Agents, who in turn would inform Dynamex. Dynamex employees would then input the drivers' availability into the Google application and the drivers would be notified of their assigned shifts.

Neither Google nor Dynamex required the Indirect Drivers to work a certain number of shifts per week. But the shifts for pre-determined time slots and, once Indirect Drivers were assigned a shift, they were required to work that shift. If a driver was unable to work an assigned shift, they were supposed to let their Master or Agent know. The Master or Agent would then inform Dynamex. Conversely, if Dynamex needed additional drivers to cover shifts, it would reach out to the Masters and Agents to see if they had any available drivers. Under the SOW, Google charged Dynamex a fee for shifts that went uncovered and, if a shift went uncovered because the assigned driver did not show, Dynamex would pass that charge on to the driver's Master or Agent. S&B, for example, would then pass these fees on to the drivers themselves by deducting from their pay checks. But the parties dispute whether the Masters and Agents always would charge their drivers for missed shifts.

For each shift, drivers were required to report to an assigned starting location 15 minutes before the shift started. The starting location was selected and communicated to the

drivers by Google. Drivers were required to login to the Google Express application five minutes before their shift started, but they could only login if they were already at their starting location. Once a shift started, drivers were required to complete deliveries in the order they were assigned by Google and in accordance with the routes provided by Google. Although drivers primarily took directions from Google during their shifts, they would sometimes receive additional instructions from Dynamex dispatchers. Dynamex claims, however, that when this happened its dispatchers were only relaying instructions that came from Google.

Dynamex also periodically would send emails to its Masters and Agents asking that they remind their drivers about Google's standard operating procedures for making deliveries and/or notify them of changes to those procedures. Google tracked the drivers' performance through its application and would charge Dynamex fees when the drivers did not follow the specified procedures (e.g., showing up late for a shift, making deliveries out of order). Dynamex would then pass these fees on to the drivers' Masters or Agents via deductions from their per shift payments. Again, the parties dispute whether these charges were always passed on to the drivers by their Masters or Agents. The parties also dispute whether Dynamex had the authority to terminate drivers if they failed to perform adequately. Dynamex

insists that only Google or the Masters and Agents could terminate a driver.

While completing Google Express deliveries, drivers were required to wear Google-approved apparel. Ouadani claims that this was a Dynamex requirement, while Dynamex claims it was a Google requirement. What constituted Google-approved apparel meant different things at different times. From June 2014 through at least February 2016, Google required that Indirect Drivers wear uniforms and badges bearing its own logo. And, from at least April 2016 to October 2016, it required uniforms and badges with Dynamex's logo. Drivers were also required periodically to complete supplemental trainings on Google standard operating procedures. These trainings were designed by Google, and Dynamex would notify the drivers of the trainings. As with the uniform policy, the parties disagree about whether Dynamex or Google required the supplemental trainings.

   e.   *Payment and Deductions*

Dynamex did not directly make payments to the Indirect Drivers. Instead, Dynamex made payments to the Masters and Agents for the shifts their Indirect Drivers worked. These payments were for a per shift amount less any applicable deductions. Dynamex paid a fixed amount per shift regardless of the time needed to complete the shift or the miles driven. This per shift rate was negotiated between Dynamex and the individual

Masters and Agents. Dynamex deducted from these amounts various costs for services and equipment, such as background checks, insurance, uniforms, scanners, and radios. Dynamex also took deductions when a driver missed a shift, logged in late for a shift, or when a Google Express customer complained about missing or damaged goods (i.e., customer "cargo claims"). All of this information was tracked in Dynamex's proprietary software system, Dynamex Enterprise Courier Software ("DECS").

The parties dispute how the Masters and Agents in turn paid their drivers. There is limited evidence in the record on this score. Ouadani contends that the Masters and Agents simply passed through the payments (and deductions) to the Indirect Drivers. He points to several pieces of evidence to support this theory. One of the forms that Indirect Drivers signed as part of their onboarding was the Indirect Driver/Helper Deduction Agreement (the "Deduction Agreement"). Each Deduction Agreement listed the various deductions Dynamex would take per shift and it was signed by Dynamex, a representative of the Master or Agent, and the Indirect Driver. Also, the "settlement statements" generated by Dynamex's DECS system and sent to the Masters and Agents reflected the "Total payment to driver," not the payment to the Master or Agent. And S&B simply passed the per shift payments and deductions on to its Indirect Drivers, albeit after taking a 17.5% cut for itself.

Dynamex counters that at least some Masters and Agents paid their Indirect Drivers as W-2 employees, but presents no evidence on whether the employees were paid hourly or on a shift basis.

## PROCEDURAL HISTORY

Ouadani filed this proposed class action on October 11, 2016. His complaint asserts class claims for misclassification under Mass. Gen. Laws ch. 149 § 148B (the "Massachusetts Independent Contractor Statute") (Count I), improper deductions under Mass. Gen. Laws ch. 149 § 148 (the "Massachusetts Wage Act") (Count II), minimum wage violations under Mass. Gen. Laws. ch. 151, § 1A (the "Massachusetts Minimum Wage Law") (Count III), and unjust enrichment (Count IV). It also asserts an individual claim for retaliation (Count V) and a collective action claim for minimum wage violations under the Fair Labor Standards Act (Count VI). Dynamex moved to dismiss and/or compel arbitration of all claims on February 9, 2017. The Court denied Dynamex's motion on May 10, 2017. Dynamex then appealed the Court's decision, and the case was stayed while the appeal was pending. On November 21, 2017, the First Circuit denied Dynamex's appeal. The Court subsequently lifted the stay and discovery on liability proceeded between the parties.

On October 14, 2018, Ouadani filed a motion for class certification as to Counts I and II. He seeks a class with the following definition:

> [A]ll individuals categorized by Dynamex as "indirect drivers" who performed Google Express deliveries between July 16, 2014 and October 14, 2016.

On the same day, Ouadani also filed a motion for summary judgment as to Count I only. Defendants opposed both motions. The Court held a hearing on Ouadani's class certification and summary judgment motions on January 29, 2019.

## MOTION FOR CLASS CERTIFICATION

### I.   Legal Standard

Federal Rule of Civil Procedure 23(a) imposes four "threshold requirements" applicable to all class actions:

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a); Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 613 (1997).

In addition to the requirements of Rule 23(a), the party seeking class certification must establish the elements of Rule 23(b)(1), (2), or (3). Amchem, 521 U.S. at 614. Ouadani seeks

certification under Rule 23(b)(3), which permits a class action when common questions "predominate over any questions affecting only individual members," and class resolution is "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Matters "pertinent" to evaluating predominance and superiority include:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

Ouadani has the initial burden of showing that the proposed class satisfies the Rule 23 requirements. In re Nexium Antitrust Litig., 777 F.3d 9, 27 (1st Cir. 2015). If factual premises are disputed at the class certification stage, the Court may "'probe behind the pleadings' to 'formulate some prediction as to how specific issues will play out' in order to assess whether the proposed class meets the legal requirements for certification." In re New Motor Vehicles Canadian Exp. Antitrust Litig., 522 F.3d 6, 17 (1st Cir. 2008) (quoting Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 160 (1982); Waste Mgmt. Holdings, Inc. v.

Mowbray, 208 F.3d 288, 298 (1st Cir. 2000)). A class should be certified only if "the trial court is satisfied, after a rigorous analysis," that the Rule 23 requirements have been met. Comcast Corp. v. Behrend, 569 U.S. 27, 33-34 (2013).

## II.  **Analysis**

### a.  *Numerosity*

Rule 23(a)(1)'s requirement that the proposed class be "so numerous that joinder . . . is impracticable" is a "low threshold" that typically can be satisfied with a showing that the class is comprised of at least 40 members. See Garcia-Rubiera v. Calderon, 570 F.3d 443, 460 (1st Cir. 2009). The parties agree there were 130 drivers whom Dynamex classified as Indirect Drivers and who performed Google Express deliveries in Massachusetts during the relevant period. Even if the Court were to exclude the Indirect Drivers supplied by Agents and those who were W-2 employees of Masters, the numerosity requirement still would be satisfied. Only 13 of the 130 Indirect Drivers in the proposed class were provided by Agents.[4] And, so far, only 18 of the 122 Indirect Drivers supplied by Masters have been identified as potential W-2 employees. That still leaves 99

---

[4]    This number includes the eight Indirect Drivers provided by Famm Driving and Patriot Express Logistics LLC and the five Indirect Drivers who worked for S&B between May 6, 2015 to January 6, 2016 when it was an Agent, not a Master. See Dkt. No. 79-1 at 3.

Indirect Drivers as putative class members, which is comfortably above the 40-class member threshold. Further, the Court finds that joinder of all the proposed class members would be impracticable. Thus, the proposed class satisfies Rule 23(a)(1)'s numerosity requirement.

   *b.   Commonality*

   Rule 23(a)(2) requires the identification of an issue that is by its nature "capable of classwide resolution -- which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011). The class must not only raise common questions, but those questions must also generate common answers that help resolve the litigation. Id. However, a single common issue is sufficient for the purposes of Rule 23(a)(2). Id. at 359.

   Ouadani argues that the common question that satisfies Rule 23(a)(2) is whether Dynamex misclassified its Indirect Drivers as independent contractors rather than employees. He points to several cases where courts in this district have found that a lawsuit challenging a company-wide practice or policy satisfied Rule 23(a)(2). See Garcia v. E.J. Amusements of N.H., Inc., 98 F. Supp. 3d 277, 286-88 (D. Mass. 2015) (Saris, J.) (finding defendant's payroll policies that applied to all putative class members raised common questions of law and fact); George v.

Nat'l Water Main Cleaning Co., 286 F.R.D. 168, 175 (D. Mass. 2012) (Casper, J.) (finding allegation that defendants misclassified putative class members as "laborers" raised numerous common questions of law and fact); Overka v. Am. Airlines, Inc., 265 F.R.D. 14, 18 (D. Mass. 2010) (Young, J.) (finding defendants' nationwide policy of charging fees to customers that allegedly deprived its employees of tips raised common questions of law and fact). Further, Ouadani argues that the question of whether the indirect drivers qualify as employees of Dynamex under the Massachusetts Independent Contractor Statute can be answered with common proof because he has set forth evidence of Dynamex's policies and practices through which it exercised control over all of the Indirect Drivers.

The Court agrees with Ouadani that the proposed class satisfies the commonality requirement of Rule 23(a)(2). Ouadani is only seeking class certification for two of his claims -- misclassification (Count I) and improper deductions (Count II) under Massachusetts law. Whether or not the Indirect Drivers were properly classified as independent contractors rather than employees is a central question to both claims. Ouadani argues that the Indirect Drivers were employees because Dynamex had actual control over them. To this end, he points to evidence that the Indirect Drivers were subject to, inter alia, the same

orientation program, shift scheduling procedures, and uniform requirements. In <u>DaSilva v. Border Transfer of MA, Inc.</u>, 296 F. Supp. 3d 389, 401 (D. Mass. 2017), this Court held that those same types of evidence were sufficient to show actual control under the Massachusetts Independent Contractor Statute, at least for the purposes of Rule 23(a)(2). <u>See also</u> <u>Vargas v. Spirit Delivery & Distribution Servs., Inc.</u>, 245 F. Supp. 3d 268, 287 (D. Mass. 2017) (finding that defendant's control over delivery drivers classified as independent contractors could be determined by reference to evidence of its common policies and practices). The Court sees no reason to reach a different conclusion here.

Indeed, Dynamex's responses to these arguments are unavailing. It principally relies on <u>Magalhaes v. Lowe's Home Centers, Inc.</u>, in which another court in this district declined to certify a class of independent contractors who worked for Lowe's as installers of flooring, millwork, cabinets, and countertops. No. CIV.A. 13-10666-DJC, 2014 WL 907675, at *9 (D. Mass. Mar. 10, 2014) (Casper, J.). But in reaching its decision, the <u>Magalhaes</u> court specifically distinguished contrary cases involving delivery drivers, reasoning that the key difference between the Lowe's installers and delivery drivers was that the latter group performed only a single service and so operated with less autonomy from their putative employer. <u>Id.</u> at *5-6.

For this reason, Magalhaes is inapplicable here given that the Indirect Drivers were delivery drivers that performed a single service for Dynamex.

Dynamex's other arguments, meanwhile, focus on the differences between the Indirect Drivers and the potential individualized questions that those differences raise. Yet Dynamex overstates its case by arguing that no common fact exists amongst the Indirect Drivers. Rather, Dynamex concedes the existence of several policies and practices that were applicable to all the Indirect Drivers. The evidence of Dynamex's common policies and practices may or may not ultimately establish that the Indirect Drivers were its employees, but this type of evidence is sufficient for determining liability on a class-wide basis. See DaSilva, 296 F. Supp. 3d at 401 ("[T]he question at this stage is whether the level of actual control can be determined by common evidence . . . ."); see also Vargas, 245 F. Supp. 3d at 285 (certifying class but declining to grant summary judgment in favor of plaintiffs as to employee status because there were material disputes of fact as to defendant's degree of control). In any case, Dynamex's arguments concerning the prevalence of individualized questions are more applicable to Rule 23(b)(3)'s predominance requirement, which the Court addresses in further detail below.

Accordingly, the Court finds that the proposed class satisfies Rule 23(a)(2)'s commonality requirement.

    *c.   Typicality*

"Typicality requires that the class representative's 'injuries arise from the same events or course of conduct as do the injuries of the class,' but his claims need not be 'identical to those of absent class members.'" Henderson v. Bank of N.Y. Mellon, N.A., 332 F. Supp. 3d 419, 427 (D. Mass. 2018) (quoting In re Credit Suisse–AOL Sec. Litig., 253 F.R.D. 17, 23 (D. Mass. 2008)). This requirement is "not highly demanding because the claims only need to share the same essential characteristics, and need not be identical." Payne v. Goodyear Tire & Rubber Co., 216 F.R.D. 21, 24-25 (D. Mass 2003); see also DaSilva, 296 F. Supp. 3d at 404 (acknowledging Rule 23(a)(3)'s "permissive standards"). The commonality inquiry under Rule 23(a)(2) and the typicality inquiry under Rule 23(a)(3) are closely related and "tend to merge." Falcon, 457 U.S. at 151 n.13. Further, Rule 23(a)(3) tolerates even significant differences between the named plaintiff and the proposed class members as long as the named plaintiff's experience is "reasonably coextensive" with the experiences of the rest of the class. See DaSilva, 296 F. Supp. 3d at 405.

The parties' arguments concerning typicality are derivative of their arguments concerning commonality. Dynamex highlights

the differences between Ouadani and the other Indirect Drivers. Ouadani counters that he is typical of the other Indirect Drivers because his claims arise from same Dynamex policies and practices that applied to the other Indirect Drivers. The Court agrees with Ouadani for the same reasons it agrees with him on commonality. Even though there may be some differences between Ouadani and the putative class members, what matters is that they are bound together by a common legal theory. Id. Dynamex also complains about the sufficiency of Ouadani's evidence, pointing out that he has not provided any testimony from other proposed class members to demonstrate that his experience was typical of theirs. But this is not necessary.[5] Ouadani has provided evidence from Dynamex of its policies and practices as they applied to all Indirect Drivers, and he has provided his own testimony of how those policies and practices were in fact applied to him. This is sufficient for the purposes of Rule 23(a)(3). See McLaughlin v. Liberty Mut. Ins. Co., 224 F.R.D. 304, 310 (D. Mass. 2004) (finding typicality requirement

---

[5]    The two cases Dynamex cites to suggest otherwise were FLSA conditional certification cases, and the only evidence in the record at the time of the motion for conditional certification were the affidavits of the named plaintiffs. See Rios v. Current Carrier Corp., No. CIV.A. 14-10247-GAO, 2015 WL 1443058, at *2 (D. Mass. Mar. 30, 2015); O'Donnell v. Robert Half Int'l, Inc., 429 F. Supp. 2d 246, 250 (D. Mass. 2006). Ouadani has provided far more robust evidence of Dynamex's policies and practices than plaintiffs did in those FLSA cases.

satisfied where class claims arose from "the same policies and wrongful conduct of the Defendant, and [we]re based on the same legal theories"). Thus, the Court finds that the proposed class satisfies Rule 23(a)(3)'s typicality requirement.

    *d.   Adequacy*

To satisfy Rule 23(a)(4)'s adequacy requirement, "[t]he moving party must show first that the interests of the representative party will not conflict with the interests of any of the class members, and second, that counsel chosen by the representative party is qualified, experienced and able to vigorously conduct the proposed litigation." Andrews v. Bechtel Power Corp., 780 F.2d 124, 130 (1st Cir. 1985). As a general matter, there is no conflict where the "named plaintiff[] and the putative class members share an interest in recovering wages lost as a result of misclassification." DaSilva, 296 F. Supp. 3d at 405. At this stage, there is no reason to believe that Ouadani's interests will conflict those of the Indirect Drivers, and any Indirect Drivers who happen to disagree with Ouadani's decision to sue Dynamex are free to opt out of the class. See id. Ouadani's chosen counsel, meanwhile, is more than qualified to prosecute this litigation on behalf of the proposed class. See Dkt. No. 72-1 (affidavit of lead counsel, Stephen Churchill, detailing extensive experience in employment litigation, which includes the prosecution of similar class action cases). For its

part, Dynamex does not challenge the adequacy of either Ouadani or his counsel to represent the proposed class. Accordingly, the Court finds that Rule 23(a)(4)'s adequacy requirement has been met.

    *e.  Predominance*

    "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." <u>Amchem</u>, 521 U.S. at 623. As part of this inquiry, courts must "give careful scrutiny to the relation between common and individual questions in a case." <u>Tyson Foods, Inc. v. Bouaphakeo</u>, 136 S. Ct. 1036, 1045 (2016). While the predominance requirement is "far more demanding" than Rule 23(a)(2)'s commonality requirement, it nevertheless assumes that some individual questions will exist. <u>Amchem</u>, 521 U.S. at 624. "When 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.'" <u>Bouaphakeo</u>, 136 S. Ct. at 1045 (quoting 7AA C. Wright, A. Miller, & M. Kane, <u>Federal Practice and Procedure</u> § 1778, at 123–24 (3d ed. 2005)).

    The predominance inquiry is where the rubber meets the road for Ouadani's class certification motion. Dynamex raises several

important issues regarding the proper scope of the proposed class.

### i. Liability Issues

Dynamex first focuses on what Ouadani needs to prove in order to establish liability under the Massachusetts Independent Contractor Statute. As outlined in more detail below, Dynamex must make two showings to avoid liability for misclassification of the Indirect Drivers as independent contractors. First, under Prong A of the statute's control test, Dynamex must show that the Indirect Contractors were free from its control both under contract and in fact. Mass. Gen. Laws ch. 149, § 148B(a)(1). Second, under Prong C, it must show that the Indirect Drivers were "customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed." Id. § 148B(a)(3). Dynamex contends that both showings require individualized proof, which prevents Ouadani from satisfying Rule 23(b)(3).

With respect to Prong A, Dynamex argues that individual questions predominate because the degree of actual control that Dynamex exercised over the Indirect Drivers varied from driver to driver. Dynamex argues that the Indirect Drivers did not have similar experiences because they worked for 21 different Masters and Agents. In particular, Dynamex observes (1) drivers were recruited, onboarded, and orientated in different ways;

(2) drivers were subject to different uniform requirements; and (3) not all drivers drove their own vehicles. The first point has some merit because there does appear to have been significant variance in how Indirect Drivers were recruited, onboarded, and orientated. But this variance is mostly accounted for by the differences between Masters and Agents. Agents recruited their own drivers and, under their contracts with Dynamex, they were solely responsible for onboarding those drivers. The Indirect Drivers supplied by Agents were also different in that Dynamex only used them to cover "overages" when Google's demand for drivers exceeded the number of drivers provided by Masters. This was reflected in the fact that Agents were required to have more than 50% of their business come from clients other than Dynamex. All of this suggests that Dynamex exercised a lesser degree of control over the Indirect Drivers provided by Agents. These issues can be addressed, however, by simply excluding that subset of drivers from the class.

Dynamex's other two points are less persuasive. It is true that at different times Indirect Drivers were required to wear different uniforms and badges: at the beginning of the class period they wore Google-branded uniforms and badges and at the end they wore Dynamex-branded ones. For the purposes of analyzing control, however, the key fact is that at all relevant times the Indirect Drivers were subject to a uniform

requirement. Differences in the exact uniforms and badges worn by the Indirect Drivers do not raise individualized issues serious enough to defeat class certification. Meanwhile, Dynamex does not explain why the fact that some Indirect Drivers used their own vehicles while others used vehicles provided by the Masters and Agents is relevant to the inquiry into Dynamex's degree of control over the Indirect Drivers.[6] And Dynamex concedes elsewhere in its briefing that most Indirect Drivers used their own vehicles. That a small minority of the putative class drove vehicles provided by their Masters or Agents is not enough for the Court to conclude that individual issues predominate.

With respect to Prong C, Dynamex argues that the factfinder will need to determine whether each Indirect Driver actually engaged in independent business, which will also require individualized proof. It is true that this may form part of the Prong C analysis. See DaSilva v. Border Transfer of MA, Inc., 377 F. Supp. 3d 74, 96 (D. Mass. 2019) (determining that the

---

[6]    If anything, the drivers that did not use their own vehicles to make deliveries are different from the other putative class members because they cannot claim damages for mileage-related expenses. But individualized damages questions alone are not a bar to class certification. See Smilow v. Sw. Bell Mobile Sys., Inc., 323 F.3d 32, 40 (1st Cir. 2003) ("Where, as here, common questions predominate regarding liability, then courts generally find the predominance requirement to be satisfied even if individual damages issues remain.").

applicable standard is unclear but both "[t]he nature of the services performed and the actual and customary conditions of employment of the workers are relevant to the [Prong C] inquiry"). But at the class certification stage the Court is entitled to "probe behind the pleadings" so as to make predictions about how the litigation is likely to unfold. In re New Motor Vehicles, 522 F.3d at 17 (quoting Falcon, 457 U.S. at 160). There are at least two reasons why the Court finds it unlikely that the Prong C inquiry will cause individual issues to predominate over common ones.

First, Ouadani only needs to prevail on one prong of the control test to establish that the Indirect Drivers were employees of Dynamex. So far, he has focused his efforts on Prong A and, in particular, the question of actual control as evidenced by Dynamex's common policies and practices. In his view, this is the beginning and end of the analysis of the Indirect Drivers' employment status and there is no need to reach Prong C. But even if the parties do end up contesting Prong C at trial, the Court expects that Prong A will remain the focus. Second, Dynamex asserts Prong C arguments that are based on common proof. For example, Google Express shifts lasted four to six hours and there was no requirement that drivers work a certain number of shifts per week, meaning they could control their hours and budget time for other clients or jobs. Dynamex

also contends that this is borne out by "random sampling" of its shift data for the Indirect Drivers, which shows that many drivers performed Google Express deliveries less than full time. These arguments suggest that the Prong C inquiry also may turn on common proof.

### ii. Damages Issues

Dynamex also gains some traction arguing that the calculation of damages in this case will raise too many individualized issues. While ordinarily individual damages questions do not defeat class certification, see Smilow, 323 F.3d at 40; DaSilva, 296 F. Supp. 3d at 406, Dynamex's business model of hiring Indirect Drivers through Masters and Agents threatens to create especially complex damages issues. Dynamex paid the Masters and Agents, not the Indirect Drivers. How the Masters and Agents in turn paid their Indirect Drivers is intensely disputed but there is little in the way of direct evidence to support either parties' position. Calculating damages, then, may require the factfinder to examine the compensation schemes employed by each individual Master and Agent. This also potentially raises individualized issues in determining liability. If a Master or Agent did not pass on deductions to its drivers or compensated them for mileage-related expenses, then those drivers might not have any claim at all.

Dynamex argues that there is no common proof that that will allow the factfinder to determine what deductions were taken from the Indirect Drivers' pay and what business expenses were reimbursed because the compensation schemes will vary between Masters and Agents. In similar circumstances, courts in this district have declined to certify classes that include so-called "secondary drivers" who worked directly for companies other than the defendant. See Martins v. 3PD, Inc., No. CIV.A. 11-11313-DPW, 2013 WL 1320454, at *8 (D. Mass. Mar. 28, 2013) (certifying class for misclassification claim that included secondary drivers but declining to certify class for improper deductions claim due to complex damages issues created by secondary drivers); Martins v. 3PD Inc., No. CIV.A. 11-11313-DPW, 2014 WL 1271761, at *11 (D. Mass. Mar. 27, 2014) (amending prior class certification ruling and re-defining class to exclude secondary drivers); see also DaSilva, 296 F. Supp. 3d at 406 (defining class to exclude secondary drivers); Vargas, 245 F. Supp. 3d at 285 (same). But Ouadani contends this case is different. He asks the Court to draw the inference that the Masters and Agents simply passed through Dynamex's deductions to their drivers and did not reimburse them for business expenses such as mileage. In his view, Dynamex's two-tiered business model served no practical purpose other than to shift potential wage and hour liability to the Masters and Agents. If the Court draws the

requested inference, then class damages can be calculated using data from Dynamex's DECS system (i.e., common proof) which tracked shifts, deductions, and miles for the individual drivers.

There is compelling evidence to support this inference. First, Dynamex's corporate representative conceded at his deposition that the company moved away from contracting directly with drivers in response to a prior class action lawsuit. Second, Dynamex had the Indirect Drivers sign Deduction Agreements in which they purportedly agreed to the deductions Dynamex and/or the Masters and Agents would take from their pay. Third, the settlement statements generated by Dynamex and sent to the Masters and Agents for the individual drivers recorded the "Total payment to driver." Fourth, S&B in fact did pass through Dynamex's payments and deductions to Ouadani (after taking a 17.5% cut for itself). S&B's corporate representative also testified at his deposition that many of its drivers were referred to it by Dynamex, which further suggests that Dynamex not the Masters or Agents decided which drivers would perform Google Express deliveries. Fifth, there is limited evidence in the record concerning the function of the Masters and Agents other than that they made payments to drivers. Rather, Google and Dynamex appear to have handled most of the day-to-day management of the Indirect Drivers.

In response, Dynamex points to the fact that some of the Masters paid their drivers as W-2 employees. This is a fair point. Because W-2 employees are entitled to certain employment benefits and are subject to tax withholding, it is unlikely that these Masters were simply passing through payments from Dynamex to the Indirect Drivers. While Dynamex has not offered any evidence of how exactly the Masters compensated their W-2 employees (i.e., an hourly rate vs. salary), the Court agrees that calculating their damages will likely require individualized proof. Moreover, it is not clear to the Court that Dynamex can even be held liable for misclassifying Indirect Drivers as independent contractors if they were in fact classified by their Masters as employees. But these issues can be avoided by excluding all W-2 employees from the class. For the remaining Indirect Drivers, however, Dynamex merely speculates that their Masters and Agents may have used different compensation schemes. This is not enough to overcome the inference suggested by Ouadani and supported by the evidence that is actually in the record.[7]

---

[7]     The Court recognizes that the parties have not yet conducted discovery on damages. If that process reveals the Masters and Agents employed more complicated and varied compensation schemes than the evidence currently suggests, Dynamex of course is free to move to decertify the class. See In re Sonus Networks, Inc. Sec. Litig., 229 F.R.D. 339, 348 (D. Mass. 2005) ("[T]he court may decertify a class at anytime before final judgment.").

Therefore, the Court concludes that subject to the modifications described above -- the exclusion of the Indirect Drivers who (1) worked for Agents and (2) were W-2 employees of Masters -- the proposed class satisfies Rule 23(b)(3)'s predominance requirement.

    *f.   Superiority*

Under Rule 23(b)(3), the Court also must be satisfied that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." The superiority inquiry is closely related to the predominance inquiry, see <u>Amchem</u>, 521 U.S. at 615-16, and Dynamex's arguments concerning superiority mostly re-hash those it made regarding predominance. For largely the same reasons, the Court does not find these arguments persuasive. Rather, the Court agrees with Ouadani that "that efficiency and the policy considerations unique to the employment context make class adjudication superior." <u>DaSilva</u>, 296 F. Supp. 3d at 406. The Court is satisfied that Rule 23(b)(3)'s superiority requirement is satisfied.

    *g.   Ascertainability*

In addition to the textual requirements of Rule 23, the First Circuit adds an ascertainability requirement to the class certification analysis. "[T]he definition of the class must be 'definite,' that is, the standards must allow the class members

36

to be ascertainable." In re Nexium, 777 F.3d at 19. The members
of the class are ascertainable if the class definition uses
"objective criteri[a]." See Matamoros v. Starbucks Corp., 699
F.3d 129, 139 (1st Cir. 2012). The parties do not contest this
issue and the Court sees no reason why the class members are not
ascertainable here. Indeed, the parties agree which Google
Express drivers fall within the class as proposed by Ouadani.
And the Court's modifications to the proposed class do not
impact ascertainability. Whether the Indirect Drivers worked for
Masters or Agents and whether they were employed as W-2
employees or independent contractors are both objective
criteria. Thus, the Court finds that the class satisfies the
First Circuit's ascertainability requirement.

## MOTION FOR SUMMARY JUDGMENT

I. **Legal Framework**

   a. **Standard of Review**

Summary judgment is appropriate when "there is no genuine
dispute as to any material fact and the movant is entitled to
judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute
of fact is considered genuine if "a reasonable jury, drawing
favorable inferences, could resolve it in favor of the nonmoving
party." Triangle Trading Co. v. Robroy Indus., Inc., 200 F.3d 1,
2 (1st Cir. 1999) (quotation omitted). "A fact is material if it
has the potential of determining the outcome of the litigation."

Patco Constr. Co. v. People's United Bank, 684 F.3d 197, 207 (1st Cir. 2012) (quotation omitted). The burden is on the party moving for summary judgment to establish that there are no genuine disputes of material fact. Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000). Critically, the Court must view the entire record in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor. Farmers Ins. Exch. v. RNK, Inc., 632 F.3d 777, 779-80 (1st Cir. 2011).

### b. **Massachusetts Wage Act**

The Massachusetts Wage Act "requires prompt and full payment of wages due." Camara v. Attorney Gen., 941 N.E.2d 1118, 1121 (Mass. 2011). To receive protection under the Wage Act, an individual must "provide services to an employer as an employee (rather than as an independent contractor)." Sebago v. Bos. Cab Dispatch, Inc., 28 N.E.3d 1139, 1146 (Mass. 2015) (quoting Somers v. Converged Access, Inc., 911 N.E.2d 739, 748 (Mass. 2009)). The Massachusetts Independent Contractor Statute governs whether an individual qualifies as an employee or an independent contractor for purposes of the Massachusetts Wage Act:

> [A]n individual performing any service, except as authorized under this chapter, shall be considered to be an employee ... unless:
>
>> (1) the individual is free from control and direction in connection with the performance of the service, both under his contract for the performance of service and in fact; and

(2) the service is performed outside the usual course of the business of the employer; and,

(3) the individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed.

Mass. Gen. Laws ch. 149, § 148B(a); Chambers v. RDI Logistics, Inc., 65 N.E.3d 1, 7 (Mass. 2016). The statute presumes that a worker is an employee and requires the employer to satisfy all three prongs by a preponderance of the evidence to show that the worker is an independent contractor instead. See Chambers, 65 N.E.3d at 7-8; Somers, 911 N.E.2d at 747. The three prongs are referred to as Prongs A, B, and C (or sometimes Prongs 1, 2, and 3) in the caselaw. The statute aims "to protect workers by classifying them as employees, and thereby grant them the benefits and rights of employment, where the circumstances indicate that they are, in fact, employees." Sebago, 28 N.E.3d at 1146 (quoting Depianti v. Jan-Pro Franchising Int'l, Inc., 990 N.E.2d 1054, 1066 (Mass. 2013)). Courts interpret the statute in a manner consistent with this purpose. Id.

The First Circuit has held that Prong B is preempted by the Federal Aviation Administration Authorization Act of 1994 ("FAAAA") as applied to entities such as Dynamex that arrange product deliveries. See Mass. Delivery Ass'n v. Healey, 821 F.3d 187, 189 (1st Cir. 2016); Schwann v. FedEx Ground Package Sys., Inc., 813 F.3d 429, 442 (1st Cir. 2016). Thus, for Dynamex to

39

defeat the presumption of employment, it must prevail on both
Prongs A and C. Conversely, Ouadani can prevail by showing that
either Prong A or C is not satisfied. See Sebago, 28 N.E.3d at
1146 ("The failure to satisfy any prong will result in the
individual's classification as an employee.").

To satisfy Prong A, Dynamex must show that the worker "is
free from control and direction in connection with the
performance of the service, both under his contract for the
performance of service and in fact." Mass Gen. Laws ch. 149, §
148B(a)(1) (emphasis added). The worker need not "be entirely
free from direction and control from outside forces" to qualify
as an independent contractor. Athol Daily News v. Bd. of Review
of Div. of Emp't & Training, 786 N.E.2d 365, 371 (Mass. 2003)
(internal quotation omitted). Instead, the Prong A analysis
focuses on "the right to control the details of the performance
and the freedom from supervision 'not only as to the result to
be accomplished but also as to the means and methods that are to
be utilized in the performance of the work.'" Id. (citation
omitted) (quoting Maniscalco v. Dir. of Div. of Emp't Sec., 97
N.E.2d 639, 640 (Mass. 1951)). "Prong A itself contains a
conjunctive test under which the plaintiffs need only prevail on
one branch." DaSilva, 296 F. Supp. 3d at 400. Accordingly, "a
company asserting that a worker is an independent contractor

must show that the individual was free from its control both as a matter of contract and as a matter of fact." Id.

II. **Analysis**

Ouadani contends that Dynamex cannot bear its burden on either part of the Prong A inquiry and, therefore, he is entitled to summary judgment on Count I of his complaint for misclassification of the Indirect Drivers.

The analysis of contractual control is complicated by the fact that the Indirect Drivers did not contract directly with Dynamex. Ouadani tries to argue that the SOW and Amended SOW between Dynamex and Google, which required that Dynamex make sure that the Indirect Drivers possess certain qualification and comply with Google's standard operating procedures, is proof of contractual control. But these are not the relevant contracts. See Mass. Gen. Laws ch. 149, § 148B(a) ("the individual is free from control and direction . . . under his contract for the performance of service" (emphasis added)). While the terms of SOW and Amended SOW may support an inference that Dynamex exercised actual control over the Indirect Drivers, they do not establish that Dynamex had contractual control. The relevant contracts for this analysis are (1) the Indirect Drivers' contracts with their respective Masters and (2) the Masters' contracts with Dynamex. Theoretically, these could be read together to determine the degree of contractual control that was

41

retained by Dynamex.[8] Yet Ouadani does not undertake any such analysis. Nor are all these contracts even in the summary judgment record.[9] Thus, the Court cannot conclude as a matter of law that Dynamex had contractual control over the Indirect Drivers.

Ouadani identifies various indicia of control that he believes establish that Dynamex was in fact an employer of the Indirect Drivers:

1.   Dynamex recruited the Indirect Drivers to perform Google Express deliveries.

2.   Dynamex ran background checks and drug tests on the Indirect Drivers.

3.   Dynamex required the Indirect Drivers to go through orientation and training programs.

4.   Dynamex issued equipment to the Indirect Drivers.

5.   Dynamex required the Indirect Drivers to wear badges and uniforms and to maintain a "professional" appearance.

6.   Dynamex assigned the Indirect Drivers shifts for specific times and durations.

---

[8]    In light of the Court's decision to exclude from the class the Indirect Drivers who contracted with Agents, it does not address in this portion of the opinion issues specific to those drivers.

[9]    The contracts between Dynamex and the Masters and Agents are in the record but not those between Masters and Agents and their Indirect Drivers. The only contract in the record to which a driver was a party is Ouadani's contract with S&B. Dynamex points out that these contracts mostly divest it of control over Ouadani.

7. Dynamex required the Indirect Drivers to report to their assigned starting location 15 minutes before their shift.

8. Dynamex did not allow the Indirect Drivers to log into the Google Express application until 5 minutes before their shift or if they were not at their assigned staging location.

9. Dynamex required the Indirect Drivers to perform deliveries in a specific order using specific routes.

10. Dynamex directed the Indirect Drivers as to how they were required to pick up parcels from particular stores.

11. Dynamex made deductions from the Indirect Drivers' pay.

Several of these factual claims are denied outright by Dynamex. It denies that it recruited most of the Indirect Drivers. It denies that it issued equipment (other than badges and uniforms) to the Indirect Drivers. It denies that it made deductions from the Indirect Drivers' pay. For other claims, Dynamex concedes that the Indirect Drivers were subject to these requirements but denies that (1) it was the source of those requirements and/or (2) it was responsible for enforcing them. Dynamex's principal point is that Google and the Masters set all the requirements around how the Indirect Drivers were to perform Google Express deliveries. Further, Google communicated directly with the drivers and monitored their compliance with its standard operating procedures through the Google Express application. To the extent Dynamex communicated directly with the Indirect Drivers during their shifts, it contends it was

simply passing on directives that came from Google. Likewise,
Dynamex claims that the orientation and training programs were
both required by and designed by Google. And Dynamex denies that
it had the ability to terminate Indirect Drivers -- rather, this
was done at the discretion of either Google or the drivers'
respective Masters.

Citing a handful cases from other jurisdictions construing
other employment statutes, Dynamex also argues that customer-
imposed requirements cannot be considered evidence of control as
matter of law. The Court disagrees with Dynamex on this point.
Neither the text of the Massachusetts Independent Contractor nor
the caselaw interpreting it recognize such a limitation. Indeed,
Massachusetts courts have recognized that it is a strict
liability statute, i.e., an employer's reasons for exercising
control over its employees are not relevant to the control
analysis. See Somers, 911 N.E.2d at 749.

In any case, not much is left in terms of undisputed facts.
Dynamex concedes it ran background checks and drug tests on the
Indirect Drivers. It also admits it issued the drivers uniforms
and badges (although it disputes that these uniforms and badges
were always Dynamex-branded). But these concessions are not
enough to establish that Dynamex controlled the "means and
methods" by which the Indirect Drivers performed Google Express
deliveries. Athol, 786 N.E.2d at 371. Ouadani contends that

44

Dynamex has manufactured many of these factual disputes by submitting an affidavit that directly contradicts the documentary evidence and the deposition testimony of its corporate representative. The Court is not persuaded. For the most part, the affidavit contradicts Ouadani's characterization of the facts. These contradictions will have to be resolved at trial. The Court does not find as a matter of law that Dynamex exercised actual control over the indirect drivers.

### ORDER

For the foregoing reasons, the Court **ALLOWS IN PART** and **DENIES IN PART** Ouadani's motion for class certification as to Counts I and II of the complaint (Dkt. No. 70). The Court certifies the following class:

> All individuals who performed Google Express deliveries between July 16, 2014 and October 14, 2016 who (1) were categorized by Dynamex as "indirect drivers," (2) were associated with a master independent contractor, and (3) were not W-2 employees of their master independent contractor.

The Court **DENIES** Ouadani's motion for summary judgment as to Count I of the complaint (Dkt. No. 71). A status conference will be held on October 1, 2019 at 9:30 AM.

SO ORDERED.

/s/ PATTI B. SARIS
Hon. Patti B. Saris
Chief United States District Judge