UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No. 16-12036-PBS

| | |
|---|---|
| DJAMEL OUADANI, on behalf of himself and all others similarly situated, | ) ) ) |
| Plaintiff | ) |
| v. | ) |
| DYNAMEX OPERATIONS EAST, LLC, | ) |
| Defendant/Third Party Plaintiff | ) |
| v. | ) |
| SELWYN AND BIRTHA SHIPPING LLC Third-Party Defendant. | ) ) ) |

**ASSENTED-TO MOTION FOR FINAL APPROVAL
OF CLASS ACTION SETTLEMENT**

Pursuant to Fed. R. Civ. P. 23, Plaintiff Djamel Ouadani ("Plaintiff" or "Mr. Ouadani"), for and on behalf of himself and a proposed settlement class, and with the assent of Defendant Dynamex Operations East, LLC, now known as TForce Final Mile LLC ("Defendant" or "Dynamex"), seeks final approval of the proposed class settlement. As discussed in more detail below, the Court preliminarily approved the settlement, and the proposed plan for notice to the class, on January 7, 2020 (ECF No. 114). A proposed order for final approval is attached as Ex. 1.

**Background**

This class action, which was filed on October 11, 2016, arises from Dynamex's alleged misclassification of delivery drivers in Massachusetts. In 2014, Dynamex entered into an agreement with Google Inc. ("Google") to provide delivery services for Google Express,

whereby Dynamex would ensure the pick up of packages from designated stores (such as Target, Walgreens, Staples, etc.) and delivery of them to designated drop-off locations (usually private homes), pursuant to designated procedures. A prior class action resolved any claims that existed prior to July 16, 2014, and the claims in this case ended on or about October 14, 2016, when Dynamex stopped performing services for Google Express.

The complaint includes six counts: (1) misclassification under M.G.L. c. 149, § 148B (Count I), (2) unpaid wages and benefits under M.G.L. c. 149, § 148 (Count II), (3) unpaid minimum wages under M.G.L. c. 151, § 1A (Count III), (4) unjust enrichment (Count IV), (5) retaliation (Count V), and (6) unpaid minimum wages under the Fair Labor Standards Act, 29 U.S.C. §§ 201 et seq. ("FLSA") (Count VI). In response to the complaint, Dynamex filed a motion to compel arbitration, which was denied. It appealed to the First Circuit, which affirmed the district court's decision. Dynamex also filed a third-party complaint for indemnification against Selwyn and Birtha Shipping LLC ("S&B"), a contractor with whom Dynamex contracted in connection with the Google Express work. The parties then engaged in discovery, including the exchange of voluminous documents and depositions of Mr. Ouadani, Dynamex, and S&B.

Following this discovery, Mr. Ouadani filed a motion for partial summary judgment as to liability under Count I, which the Court denied based on Dynamex's assertion of disputed facts. Mr. Ouadani also moved for class certification as to Count I and Count II. The Court denied the motion for partial summary judgment and allowed the motion for class certification in part, with the following class definition: "all individuals who performed Google Express deliveries between July 16, 2014 and October 14, 2016 who (1) were categorized by Dynamex as 'indirect drivers,' (2) were associated with a master independent contractor, and (3) were not W-2

employees of their master independent contractor." Mr. Ouadani and Dynamex then applied the Court's defined class to identify a specific list of 100 eligible people, including Mr. Ouadani.

On November 18, 2019, Mr. Ouadani and Dynamex (but not S&B, which chose not to participate based on claimed financial considerations) engaged in a full-day mediation with professional mediator Hon. Bonnie McLeod (ret.), culminating in an agreement as to material terms. The parties (excluding S&B) then reached agreement as to final terms, as set forth in the formal agreement ("Agreement") executed by Mr. Ouadani and Dynamex. A copy of the Agreement is attached as Ex. 2.

On December 10, 2019, S&B filed a suggestion of bankruptcy. Pursuant to 11 U.S.C. §362, all claims by and against S&B in this action are automatically stayed. However, S&B's bankruptcy does not affect the instant settlement and the automatic bankruptcy stay should not be extended to cover the claims included in instant settlement because the claims by and against S&B are not part of this settlement in any way.[1]

**Terms of Agreement**

The proposed class is as defined by the Court but excludes two individuals who were later identified as having signed arbitration agreements in favor of Dynamex. The total

---

[1] Although the automatic stay is "extremely broad in scope ... and should apply to almost any type of formal or informal action against the debtor or the property of the estate," it does not extend "to separate legal entities such as corporate affiliates, partners in debtor partnerships or to codefendants in pending litigation." *Patton v. Bearden,* 8 F.3d 343, 349 (6th Cir.1993) (quoting 2 *Collier on Bankruptcy* ¶ 362.04 (15th ed. 1993)). Nonetheless, some courts have held that the debtor's stay may be extended to non-bankrupt parties in "unusual circumstances," such as "when the debtor and the non-bankrupt party are closely related or the stay contributes to the debtor's reorganization." *Patton v. Bearden,* 8 F.3d at 349 (citations omitted). Although typically called an extension of the automatic stay to non-debtor parties, these are in fact injunctions issued by a bankruptcy court under § 105(a), after determining that the situation requires it to protect the interests of the bankruptcy estate. *Id.*

settlement fund will be $400,000, no amount of which will revert to Dynamex. Of that amount, the Agreement provides that $10,000 will be allocated to litigation and settlement administration costs, $25,000 will be allocated to an incentive payment to Mr. Ouadani, $133,333 will be allocated to attorneys' fees, and $231,667 will be allocated to fund class distributions ("Class Fund"). Class members will be entitled to pro rata shares of the Class Fund based on a formula reasonably related to the amount of their alleged damages.

Based on information obtained during discovery and through the mediation process, Plaintiff's counsel estimated that the maximum potential single damages for the class ranged from about $133,000 to about $291,000, depending on what categories of damages were recoverable. During the mediation, Defendant provided information to suggest that the actual range was substantially lower. Among other things, the amount of anticipated damages was reduced by the fact that some members of the class made deliveries using vehicles provided to them, so they did not incur the same transportation expenses as class members who used their own vehicles. Defendant also presented information that suggested that not all of the deductions contained in its settlement statement records were passed through to the class members. The total settlement amount is around 1.4 – 3.0 times the maximum potential amount of single damages, and each class member ultimately is expected to receive at least the amount of his or her single damages.

## Claims Process

On January 7, 2020, the Court granted preliminary approval of the proposed settlement and the proposed claims process. The Court also approved the form and method of notice to be issued to the class. A copy of the final notice and accompanying forms sent to the class ("Notice") is attached as Ex. 3.

Following the Court's preliminary approval, class counsel retained a third-party class action administrator (Optime Administration, LLC) to handle the Court-approved administration process. (Affidavit of Stephen Churchill ("Churchill Aff."), attached as Ex. 4, at ¶ 8). Optime set up a website with a copy of the Notice, which also allowed class members to submit forms electronically, at https://dynamexsettlement.com. (Id. at ¶ 9).  On January 9, 2020, Optime also mailed the Notice to the 99 members of the settlement class. (Affidavit of Scott Simpson ("Simpson Aff."), attached as Ex. 5, at ¶ 4). In addition, class counsel sent text messages to 53 class members for whom there were phone numbers, alerting them about the settlement and providing the address for the settlement website. (Churchill Aff. at ¶ 10).

When mailed Notices were returned as undeliverable, Optime attempted to locate updated contact information using a database called Intelius. (Simpson Aff. ¶ 4). When updated contact information was obtained, Optime promptly sent the Notice to the updated address. (Id.). Of the 99 Notices that were mailed, 15 were returned as undeliverable, and Optime was able to obtain updated contact information for eight. (Id. ¶ 5). On February 7, 2020, Optime sent a reminder to 66 class members who had not yet submitted a claim, an opt-out, or an objection. (Id. ¶ 6). Ultimately, by the claim deadline of February 23, 2020, Optime had received 35 claims, one opt-out form, and no objections. A copy of the one opt-out form is attached as Ex. 6.

If the Agreement is finally approved by the Court, class distributions will be made in two rounds. For the first round, settlement class members who filed claim forms will receive the full pro rata share they would be entitled to if all settlement class members submitted claims. For the second round, a reminder will be sent to settlement class members who have not opted out or submitted a claim form, and those class members will be given another thirty (30) days after that reminder mailing to submit a claim form. Any newly-claiming settlement class members will

receive their full pro rata share of any amounts that they did not claim in the first round. In addition, all claimants who filed timely claim forms in either the first or second round will receive their pro rata share of any remaining unclaimed amounts. Approximately one hundred and twenty (120) days after the second round of payments are made, any amounts not finally distributed (including checks that are not cashed within ninety (90) days after the second round of distributions), will be donated in a *cy pres* award to the Massachusetts IOLTA Committee.

## Argument

**1.     The proposed settlement is fair, reasonable, and adequate.**

A class action may not be compromised without court approval, which requires the court to analyze whether the settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e). A guiding principle when analyzing whether a settlement is fair, reasonable, and adequate is the well-established recognition that courts favor settlements over continued litigation. *Durett v. Housing Auth. of Providence*, 896 F.2d 600, 604 (1st Cir. 1990) (when exercising discretion to approve class action settlement, a "court's discretion is restrained by 'the clear policy in favor of encouraging settlements'") (citations omitted). *See also Newberg on Class Actions* § 13.44 (5th ed.) ("The law favors settlement, particularly in class actions and other complex cases where substantial resources can be conserved by avoiding lengthy trials and appeals.").

In light of the policy favoring settlements, "[w]hen sufficient discovery has been provided and the parties have bargained at arms-length, there is a presumption in favor of the settlement." *In re M3 Power Razor System Marketing & Sales Practice Litig.*, 270 F.R.D. 45, 62-63 (D. Mass. 2010). In this case, as discussed above, the total amount of the settlement compares favorably with the potentially recovery for the class if the case proceeded to trial. That is particularly true where continued litigation would pose significant risks for the class, including

the possibility of decertification, the possibility of a liablity finding in Dynamex's favor, and the possibility that the damages awarded to the class would be lower than requested or anticipated.

There is a "presumption that [a] settlement is within the range of reasonableness" where "'(1) the negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected.'" *Id.*, *quoting In re Lupron Mktg. and Sales Prac. Litig.*, 345 F. Supp. 2d 135, 137 (D. Mass. 2004). All four factors support approval here. First, the negotiations occurred at arms length, including a day-long mediation with retired Superior Court Justice Bonnie MacLeod. The parties took opposing positions with respect to liability and damages but were able to reach a compromise position that took each side's risks into account. Second, the parties engaged in substantial discovery prior to reaching a proposed agreement, as manifest from prior briefing, including Plaintiff's motion for partial summary judgment. "The pertinent question is 'whether counsel had an adequate appreciation of the merits of the case before negotiating.'" *Beckman v. KeyBank, N.A.*, 293 F.R.D. 467, 475 (S.D.N.Y. 2013), *quoting In re Warfarin Sodium Antitrust Litig.,* 391 F.3d 516, 537 (3d Cir. 2004) (internal quotation marks omitted). The parties' discovery was further supplemented by their "participation in a day-long mediation [, which] allowed them to further explore the claims and defenses." *Id*. Third, as this Court previously has recognized when certifying a class, class counsel are experienced in employment law and class action litigation. (Churchill Aff. ¶¶ 1-7). Finally, no member of the class objected to the proposed settlement. For all of these reasons, the Court has ample grounds for finding that the settlement is fair, reasonable, and adequate.

**2.     The proposed payment to the named plaintiff is fair and reasonable.**

The proposed incentive payment to Mr. Ouadani is intended to compensate him both for the effort and risk associated with his critical role in serving as named plaintiff, and for his more comprehensive release of claims, including his pending individual claim for retaliation (Count V of the Complaint). Significantly, no member of the class objected to the proposed incentive payment.

Courts have widely recognized that incentive awards serve an important function in promoting enforcement of state and federal law by private individuals, while encouraging class action settlements. *See In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 82 (D. Mass. 2005) ("Incentive awards are recognized as serving an important function in promoting class action settlements"), *quoting In re Lupron*, 228 F.R.D. 75, 98 (D. Mass. 2005); *In re Compact Disc Min. Adver. Price Antitrust Litig.*, 292 F. Supp. 2d 184, 189 (D. Me. 2003) ("Because a named plaintiff is an essential ingredient of any class action, an incentive award can be appropriate to encourage or induce an individual to participate in the suit"). As one court recently noted, "[s]ervice awards [i.e., incentive payments] are common in class action cases and serve to compensate plaintiffs for the time and effort expended in assisting the prosecution of the litigation, the risks incurred by becoming and continuing as a litigant, and any other burdens sustained by the plaintiffs. . . It is important to compensate plaintiffs for the time they spend and the risks they take." *Beckman*, 293 F.R.D. at 483 (citations omitted).

It is not uncommon for courts to approve incentive payments similar to those requested in this case. *See, e.g., Gordon v. Mass. Mutual Life Ins. Co.,* No. 13-CV-30184-MP, Order Regarding Plaintiffs' Motion for Attorneys' Fees, Reimbursement of Expenses, and Case Contribution Awards for Named Plaintiffs, at 7 (D.Mass. Nov. 3, 2016) (awarding incentive

payments of $20,000 each to named plaintiffs); *Castagna v. Madison Square Garden, L.P.*, 2011 WL 2208614, at *8 (S.D.N.Y. June 7, 2011) (awarding incentive payments of $10,000 and $15,000 each to named plaintiffs in wage class action); *Dupler v. Costco Wholesale Corp.*, 705 F. Supp. 2d 231, 245 (E.D.N.Y. 2010) (awarding incentive payments of $25,000 and $5,000); *Godshall v. Franklin Mint Co.*, 2004 WL 2745890, at *6 (E.D. Pa. Dec. 1, 2004) (awarding $20,000 incentive awards to each of two named plaintiffs in wage class action); *In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369, 400 (D.D.C. 2002) (awarding incentive payments of $25,000 and $10,000).

Incentive awards serve a particularly important role in employment class actions. Lead plaintiffs may risk their livelihood to bring the case forward on behalf of their fellow co-workers. Courts have recognized the important role of class actions in the employment context precisely because of this fear of potential retaliation. *See, e.g., Perez v. Safety-Kleen Systems, Inc.*, 253 F.R.D. 508, 520 (N.D. Cal. 2008) (concluding class action was superior because "some class members may fear reprisal"); *Guzman v. VLM, Inc.*, 2008 WL 597186, at *8 (E.D.N.Y. 2008) (noting "valid concern" that "many employees will be reluctant to participate in the action due to fears of retaliation"). This same consideration makes incentive awards appropriate in employment class action settlements, as well: "[Incentive] awards are particularly appropriate in the employment context. In employment litigation, the plaintiff is often a former or current employee of the defendant, and thus, by lending his name to the litigation, he has, for the benefit of the class as a whole, undertaken the risk of adverse actions by the employer or co-workers." *Frank v. Eastman Kodak Co.*, 228 F.R.D. 174, 187 (W.D.N.Y. 2005).

One critical factor here is the fact that Mr. Ouadani put his own interests behind those of the class. There is a substantial likelihood, based on common experience in this practice area,

9

that if Mr. Ouadani had expressed an interest in obtaining an individual settlement in return for dropping his pursuit of a class claim, he could have received a greater amount than he stands to receive from this settlement. Instead, he continued to pursue the case on behalf of his fellow class members.

**3.      The proposed fee should be preliminarily approved as reasonable.**

To date, class counsel have devoted considerable time in connection with this case, including a motion to compel arbitration, a First Circuit appeal, significant discovery practice, a contested class certification motion, a contested summary judgment motion, settlement negotiations, and the approval and claims process for the proposed settlement. In addition, if the settlement is finally approved, class counsel expect to spend more time with administration process. Already, the lodestar for class counsel exceeds $120,000 (Churchill Aff. ¶ 11), and likely will approach, if not exceed, the requested fee amount of $133,333.[2]

Courts frequently favor an award of fees from a common fund, as called for by the proposed settlement in this case. As the Supreme Court has explained:

> [T]his Court has recognized consistently that a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorneys' fee from the fund as a whole. . . . Jurisdiction over the fund involved in the litigation allows a Court to prevent . . . inequity by assessing attorney's fees against the entire fund, thus spreading fees proportionately among those benefited by the suit.

*Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) (citations omitted).

---

[2] As a result, the multiplier currently is less than 1.2, which is far less than what courts routinely approve in class action cases. *Conley v. Sears, Roebuck & Co.*, 222 B.R. 181, 187 (D. Mass. 1998) (approving 8.9 lodestar multiplier); *New England Carpenters Health Benefits Fund v. First Databank, Inc.*, 2009 WL 2408560, at *2 (D. Mass. Aug. 3, 2009) (approving 8.3 multiplier); *Beckman v. KeyBank, N.A.*, 293 F.R.D. 467, 481-82 (S.D.N.Y. 2013) ("[c]ourts regularly award lodestar multipliers of up to eight times the lodestar, and in some cases, even higher multipliers") (collecting cases).

When awarding fees from a common fund, the "percentage of the fund" method is preferred over the lodestar method. As the First Circuit observed, the percentage method is less burdensome to administer than the lodestar method. *In re Thirteen Appeals*, 56 F.3d 295, 307 (1st Cir. 1995). The court also endorsed the percentage method because it is result-oriented, and therefore promotes a more efficient use of attorney time – a lodestar method may give attorneys an incentive to spend as many hours as possible on the litigation and may discourage early settlements. *Id.* When using the percentage method, courts routinely approve fee awards that represent one-third of the settlement fund.

A fee award of one-third of the fund is consistent with the vital role that contingency arrangements play in making legal counsel available to individuals who cannot afford hourly fees. Unlike traditional firms that receive hourly fees on a monthly basis, employment counsel who take cases on contingency often spend years litigating cases (typically while incurring significant out-of-pocket expenses for experts, transcripts, travel, etc.), without receiving any ongoing payment for their work. Sometimes fees and expenses are recovered; other times, despite hundreds of hours of work, nothing is recovered. This type of practice is viable only if attorneys, having received nothing for their work on some cases, receive more in other cases than they would if they charged hourly fees. Courts have long recognized this reality. *See, e.g., Hensley v. Eckerhart*, 461 U.S. 424, 448 (1983) (noting that "[a]ttorneys who take cases on contingency, thus deferring payment of their fees until the case has ended and taking upon themselves the risk that they will receive no payment at all, generally receive far more in winning cases than they would if they charged an hourly rate"); *In re Union Carbide Corp. Consumer Products Business Securities Litigation*, 724 F. Supp. 160, 168 (S.D.N.Y. 1989) ("Contingent fee arrangements implicitly recognize the risk factor in litigation and that the

11

winning cases must help pay for the losing ones if a lawyer who represents impecunious plaintiffs, or those plaintiffs not so fully committed as to put their own money where their mouth is, will remain solvent and available to serve the public interest.")  By permitting clients to obtain attorneys without having to pay hourly fees, this system provides critical access to the courts for people who otherwise would not be able to find competent counsel to represent them. That access is particularly important for the effective enforcement of public protection statutes, such as the wage laws at issue in this case. It is well recognized that "private suits provide a significant supplement to the limited resources available to [government enforcement agencies] for enforcing [public protection] laws and deterring violations." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 344 (1979).

**4.     The requested award of costs is fair and reasonable.**

It is well established that "[l]awyers who recover a common fund for a class are entitled to reimbursement of litigation expenses that were reasonably and necessarily incurred in connection with the litigation." *Hill v. State St. Corp.*, 2014 U.S. Dist. LEXIS 179702, at *53 (D. Mass. Nov. 26, 2014) (Dein, J.), *citing In re Fidelity/Micron Sec. Litig.*, 167 F.3d 735, 737 (1st Cir. 1999); *Latorraca v. Centennial Techs. Inc.*, 834 F. Supp. 2d 25, 28 (D. Mass. 2011). Class counsel already have advanced over $10,000 in expenses, including expenses for filing fees, service of subpoenas to numerous third parties, mediation fees, and deposition transcripts. (Churchill Aff. ¶ 12). Class counsel also will be responsible for paying the cost of the third-party administrator, without any additional reimbursement, which is expected to be $7,300. As a result, the requested expense amount of $10,000 will be substantially less than actual expenses.

**Conclusion**

For these reasons, Mr. Ouadani respectfully request that the Court grant final approval of the proposed class settlement, as set forth in the proposed order attached as Ex. 1.

        DJAMEL OUADANI, on behalf of himself and all others similarly situated,

        By his attorneys,

        /s/ Stephen Churchill
        Stephen S. Churchill (BBO#564158)
        Brant Casavant (BBO#672614)
        FAIR WORK, P.C.
        192 South Street, Suite 450
        Boston, MA 02111
        (617) 607-6230
        steve@fairworklaw.com
        brant@fairworklaw.com

Dated: March 19, 2020

## CERTIFICATE OF SERVICE

      This will certify that on this date I served a copy of this document, by ECF, on all counsel.

Dated:  March 19, 2020                  /s/ Stephen Churchill
                                               Stephen Churchill

42236820.1